(301 P.3d 718)
No. 106,181

STEPHEN E. PURDUM, *Appellee/Cross-appellant*, v. KATHERINE C. PURDUM, *Appellee/Cross-appellee*. (ARCHDIOCESE OF KANSAS CITY IN KANSAS, *Appellant/Cross-appellee*.)

Opinion filed May 17, 2013.

*L. Martin Nussbaum*, of Rothgerber, Johnson & Lyons, LLP, of Colorado Springs, Colorado, and *Jeanne Gorman*, of Jeanne Gorman Rau, LLC, of Overland Park, for appellant/cross-appellee Archdiocese of Kansas City in Kansas.

*Robert W. Tormohlen* and *Joseph E. Bant*, of Lewis, Rice & Fingersh, L.C., of Kansas City, Missouri, for appellee/cross-appellant Stephen E. Purdum.

*Christopher P. Lawson*, of Lawson Law Office, LLC, of Overland Park, for appellee/cross-appellee Katherine C. Purdum.

Before GREEN, P.J., ATCHESON and BRUNS, JJ.

GREEN, J.: In this defamation case, Stephen E. Purdum sued his former wife, Katherine C. Harcsar, for allegedly libelous statements she made to the Archdiocese of Kansas City in Kansas. These alleged defamatory statements were made to the Archdiocesan Tribunal when Harcsar sought to annul her sacramental marriage to Purdum. Harcsar moved to dismiss Purdum's defamation action under K.S.A. 60-212(b)(6) for failure to state a claim upon which relief can be granted. She maintained that because the statements were made in the context of the annulment action, they were absolutely privileged as part of a "quasi-judicial proceeding." Before ruling on Harcsar's motion to dismiss, the trial court, with the parties' consent, solicited the Archdiocese for input as *amicus curiae*.

The Archdiocese submitted an *amicus* brief in favor of dismissal, although on somewhat different grounds. It argued that the defamation action should be dismissed under K.S.A. 60-212(b)(1) for lack of subject matter jurisdiction because it impermissibly interfered with the free exercise of religion under the First Amendment to the United States Constitution, that the statements were absolutely privileged, and that the suit ran afoul of the church autonomy doctrine. The Archdiocese further argued that church autonomy doctrine prevented the courts from reviewing or interfering with church affairs that involve faith, doctrine, governance, and policy.

When the trial court denied Harcsar's motion to dismiss, the Archdiocese moved to intervene and to become a party in the action. In its motion to intervene, the Archdiocese argued that the church autonomy doctrine prevented the trial court from exercising subject matter jurisdiction over the action. After reviewing the briefs and hearing arguments, the trial court again rejected the Archdiocese's argument based on the church autonomy doctrine and also denied its motion to intervene. In rejecting the church

autonomy doctrine, the trial court recognized that no claims were made against the church, that the statements about Purdum's mental condition were secular in nature, and that determining the truth or falsity of such statements would not require interpretation of ecclesiastical doctrine or other such entanglement with the church. Nevertheless, the trial court held that the alleged defamatory statements were made in the context of a written statement to the Archdiocese, an activity that was "absolutely privileged as made pursuant to the defendant's First Amendment right to Free Exercise of her religion." As a result, the trial court dismissed the defamation action against Harcsar for lack of subject matter jurisdiction under K.S.A. 60-212(b)(1).

On appeal, Purdum argues that the trial court erred by holding that the statements made in Harcsar's petition for annulment were absolutely privileged. Thus, he asserts that the trial court erred by finding that it lacked subject matter jurisdiction as a result of absolute privilege. This court agrees. Nevertheless, when a trial court reaches the correct result, its decision will be upheld even though it relied upon the wrong ground or assigned erroneous reasons for its decision. *Robbins v. City of Wichita*, 285 Kan. 455, 472, 172 P.3d 1187 (2007).

Here, Harcsar's alleged defamatory statements are inextricably part of the Archdiocesan Tribunal. Moreover, Purdum conceded that the only defamatory publication allegedly made by Harcsar was made to the Archdiocesan Tribunal, within its ecclesiastical procedure. Harcsar raised defenses of consent and qualified privilege to the allegedly defamatory statements she made to the Archdiocesan Tribunal. Purdum's suit thus would require the civil courts to interpret canon law concerning Harcsar's consent defense. Harcsar's consent defense and her qualified privilege defense would excessively entangle the civil courts in a matter that the First Amendment to the United States Constitution forbids. Because the Establishment Clause of the First Amendment precludes jurisdiction over the subject matter of Purdum's defamation action, this court determines that the trial court properly concluded that the First Amendment precluded its exercise of subject matter jurisdiction in this defamation action.

*Facts*

As stated earlier, the trial court dismissed Purdum's defamation action against Harcsar for lack of subject matter jurisdiction under K.S.A. 60-212(b)(1). The parties did not dispute the material facts upon which the trial court relied in dismissing the case, nor do they dispute those factual assertions for purposes of this appeal.

Purdum and Harcsar were married on April 25, 1993, in New Jersey. Before marrying, Purdum and Harcsar completed and signed the prenuptial inquiry prescribed by the Catholic Church. Moreover, in this inquiry, they both stated that they understood and consented to the obligations for a Catholic marriage. Under paragraph "44" of Exhibit C-1, it addressed Purdum's and Harcsar's consent to the authority of the Catholic Church over their marriage:

"Both spouses assent to the authority of the Catholic Church over their marriage by their free request to be married within the Catholic Church. This assent endures if one or both of the spouses later asks the Church to declare the invalidity of the same marriage. In other words, if the marriage is sacramentally celebrated within the Catholic Church, the Catholic Church has jurisdiction over not only the preparation for and liturgical celebration of the sacrament of marriage, it also has jurisdiction over the judicial process to discern whether there were defects in the marriage that warrant an ecclesiastical declaration of invalidity. Nonetheless, participation in the tribunal process is voluntary and uncoerced."

The record indicates that " 'when [a] non-Catholic spouse voluntarily enters into the process of spiritual and religious preparation for sacramental marriage, that person freely submits to the jurisdiction of the Church as regards the celebration and oversight of the sacrament of marriage.' " He or she is told about the jurisdiction of the church. For example, under Purdum's prenuptial inquiry, he was asked the following question: "Are you giving your consent to this marriage freely, without force or fear of any kind?" Purdum answered "Yes" to that question. At the end of Purdum's prenuptial inquiry, a priest/deacon and Purdum signed the inquiry. The priest/deacon affirmed that he had instructed Purdum "according to the prescripts of Canon Law and the regulations of the Diocese."

Purdum filed for divorce in Johnson County in late 2001, and the divorce was granted about 6 years later. Harcsar apparently wished to remarry in a Catholic ceremony. The Catholic Church will allow a later marriage when an annulment is granted for any previous marriage. Thus, before Harcsar could remarry in a Catholic ceremony, she needed to obtain an annulment of her marriage to Purdum.

In February 2009, Harcsar filed a petition for annulment with the Archdiocesan Tribunal. As provided in the rules for the Tribunal, the Archdiocese sent a copy of the petition to Purdum and informed him that he could participate in the annulment proceeding if he wanted. Persons affiliated with the Archdiocese read the petition in connection with the annulment process. The petition and the process are confidential. Only church officials directly involved in that process would be privy to the information contained in the petition.

In his civil suit, Purdum alleged that the statements Harcsar made about him in her annulment petition were false and defamatory. His amended petition described briefly the nature of the alleged defamation as an assertion that he had been "diagnosed as bipolar." The suit contends that Harcsar knew those statements to be false. The amended petition made no claim against the Archdiocese or any of its employees, agents, or members of the Tribunal.

With the consent of Purdum and Harcsar, the trial court invited the Archdiocese to appear in the case as *amicus curiae* because the dispute arose out of an annulment of a sacramental marriage. In that capacity, the Archdiocese filed a brief urging dismissal of the suit based on privilege and church autonomy. The Archdiocese then moved to intervene as a party as a matter of right under K.S.A. 60-224(a)(2). As an exhibit to the request to intervene, the Archdiocese submitted a motion to dismiss Purdum's suit under K.S.A. 60-212(b)(1) for lack of subject matter jurisdiction. Harcsar endorsed and incorporated the arguments made in the Archdiocese's motion to dismiss as her own arguments. The motion to dismiss focused on various theories grouped under the church autonomy doctrine. The trial court ultimately denied the Archdiocese's re-

quest to intervene but ruled on the substantive arguments that the Archdiocese had raised for dismissing Purdum's suit. In its memorandum decision, the trial court ruled that church autonomy doctrine did not warrant dismissal of the defamation action. But the trial court ruled that the Free Exercise Clause of the First Amendment to the United States Constitution afforded Harcsar an absolute privilege against liability for her statements to the Archdiocesan Tribunal.

*Did the Trial Court Err in Dismissing Purdum's Defamation Claim for Lack of Subject Matter Jurisdiction Based on an Absolute Privilege under the First Amendment to the United States Constitution?*

Purdum maintains that the trial court's holding that Harcsar's alleged defamatory statements were absolutely privileged under the First Amendment was unjustified. Moreover, he contends that the trial court compounded this error in holding that it lacked subject matter jurisdiction as a result of the absolute privilege. Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, 609, 244 P.3d 642 (2010).

On the other hand, Harcsar, endorsing and incorporating the briefs and exhibits filed by the Archdiocese as her own briefs and exhibits, contends that because an absolute privilege existed under the Free Exercise Clause of the First Amendment and that because Purdum's defamation action would entangle the civil courts in an ecclesiastical subject matter contrary to the church autonomy doctrine, this divested the trial court of subject matter jurisdiction.

At the outset, this court notes that the trial court dismissed Purdum's defamation action under K.S.A. 60-212(b)(1) for lack of subject matter jurisdiction because the First Amendment to the United States Constitution prohibited the trial court from adjudicating this matter. Under the Federal Rules of Civil Procedure, a Rule 12(b)(1) motion goes to the court's " 'very power to hear the case.' " *Robinson v. Dalton*, 107 F.3d 1018, 1021 (3d Cir. 1997).

*Religious Guaranty under the First Amendment*

The religious guaranty under the First Amendment is divided into two parts: (1) the Establishment Clause and (2) the Free Ex-

ercise Clause. These clauses draw a line between church and state in two important ways. First, the Establishment Clause states: "Congress shall make no law respecting an establishment of religion." Based on the language of this clause, Congress remains free to legislate on matters about religion (for example, the excusing of religious pacifists from military service), but Congress cannot enact any legislation advancing a matter "respecting an establishment of religion."

Yet, the reach of the Establishment Clause is not limited to forbidding an established church. This Clause imposes a requirement of official neutrality in religious disputes, which the United States Supreme Court has characterized as one of "benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Walz v. Tax Commission of New York*, 397 U.S. 664, 669, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970).

Second, the Free Exercise Clause "withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion"; it protects the right of "religious liberty in the individual" to practice one's faith unrestricted by civil authority. *School Dist. v. Schempp*, 374 U.S. 203, 222-23, 83 S. Ct. 1560, 10 L. Ed. 2d 844 (1963).

The First Amendment religious clauses are applicable to the states by virtue of the Fourteenth Amendment to the United States Constitution. Moreover, the First Amendment applies to judicial power. *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190, 191, 80 S. Ct. 1037, 4 L. Ed. 2d 1140 (1960).

The threshold inquiry here is whether the underlying dispute is a secular one, capable of review by a civil court, or an ecclesiastical one about "discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976).

*Free Exercise Clause*

In ruling that defendant's alleged defamatory statement was protected under "the defendant's First Amendment right to Free Exercise of her religion," the trial court grounded its decision upon the holding in *Cimijotti v. Paulsen*, 230 F. Supp. 39 (N.D. Iowa

1964), *aff'd* 340 F.2d 613 (8th Cir. 1965). In *Cimijotti*, a husband sued his wife and two other women for conspiracy to harm the husband's reputation because of testimony they gave to the Catholic Church. The court dismissed the claim against the wife because of common-law spousal immunity. It dismissed the case against the two other witnesses, reasoning:

"To allow slander actions to be based solely upon statements made to the Church before its recognized officials and under its disciplines and regulations would be a violation of the First Amendment. The law withdraws from the State any exertion of restraint on free exercise of religion. The freedom of speech does not protect one against slander, yet a *person must be free to say anything and everything to his Church*, at least so long as it is said in a recognized and required proceeding of the religion and to a recognized official of the religion. . . . [T]he person must not be prohibited, by fear of court action either civil or criminal against his person or property, from actually making the communication." (Emphasis added.) 230 F. Supp. at 41.

The *Cimijotti* court then held that "based upon the common law . . . and the First Amendment," the defendants' statements to the Catholic Church "are absolutely privileged against an action for defamation. On this basis, the plaintiff's complaint would have to be dismissed." 230 F. Supp. at 42.

Here, Harcsar claims an absolute privilege against liability for her statements to the Archdiocesan Tribunal under the First Amendment. In *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940), the Court stated that the First Amendment has a dual purpose. First, "it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship." Second, "it safeguards the free exercise of the chosen form of religion." As a result, "the Amendment embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." 310 U.S. at 303-04. Thus, the freedom to act, even when the action is in accord with one's religious convictions, is not totally free from regulation for the protection of society. In other words, laws over one's religious beliefs and opinions are prohibited by the First Amendment. Nevertheless, laws may reach one's actions or practices when they are found to violate some important social order, although the ac-

tions or practices are required by one's religion. See *Prince v. Massachusetts*, 321 U.S. 158, 166-68, 64 S. Ct. 438, 88 L. Ed. 645 (1944) (The Court upheld a statute making it a crime for a girl under 18 years of age to sell any newspapers, periodicals, or merchandise in public places despite the fact that a child of the Jehovah's Witnesses' faith believed that it was her religious *duty* to perform this work.); *Reynolds v. United States*, 98 U.S. 145, 166-67, 25 L. Ed. 244 (1878) (The Court upheld the polygamy conviction of a member of the Mormon faith despite the fact that an accepted doctrine of his church then imposed upon its male members the *duty* to practice polygamy.).

Here, Harcsar's alleged defamatory statements—that Purdum had been "diagnosed as bipolar"—are not of the kind normally associated with someone's religious beliefs and opinions. Harcsar's statements do not express an inherently religious belief or religious purpose. Thus, these statements should not enjoy an absolute privilege against liability under the Free Exercise Clause of the First Amendment. Although the trial court's reliance on *Cimijotti*'s absolute privilege ruling may have been misplaced, a trial court's decision will be upheld even though it relied upon the wrong ground or assigned erroneous reasons for its decision. *Robbins*, 285 Kan. at 472.

Harcsar, in her responsive pleadings, advances another absolute privilege argument. She maintains that an absolute privilege existed for her alleged defamatory statements on the grounds that her statements were made in a "quasi-judicial proceeding." Privilege, absolute or qualified, is a complete defense against liability for libel. Prosser, Law of Torts § 114, at 776 (4th ed. 1971). The question of whether a publication is privileged is a question of law to be determined by the court. *Turner v. Halliburton Co.*, 240 Kan. 1, 8, 722 P.2d 1106 (1986).

Absolute privilege concerning defamatory publications has been "confined to a few situations where there is an obvious policy in favor of permitting complete freedom of expression, without inquiry as to the defendant's motives." Prosser, Law of Torts § 114, at 777. For example, in Kansas, an absolute privilege has been limited to those individuals "who serve in a legislative, executive

or judicial capacity." *Turner*, 240 Kan. at 7. See also *Weil v. Lynds*, 105 Kan. 440, 443, 185 P. 51 (1919) (Witnesses in judicial proceedings enjoy an absolute privilege against slander actions so long as their answers to questions are some way pertinent to the issue being tried; otherwise they enjoy a qualified privilege, depending upon whether they "acted in good faith and believed the matter to be pertinent as well as true."). Absolute privilege is granted by constitution, legislative enactment, or caselaw to facilitate the effective performance of government. *Turner*, 240 Kan. at 7.

This court explained the purpose of absolute privilege in *Sampson v. Rumsey*, 1 Kan. App. 2d 191, 194, 563 P.2d 506 (1977):

"Absolute privilege is founded on public policy and provides immunity for those engaged in the public service and in the enactment and administration of law. It is not intended so much for the protection of those engaged in that service as it is for the promotion of the public welfare, the purpose being that members of the legislature, judges of courts, jurors, lawyers and witnesses may speak their minds freely and exercise their respective functions without incurring the risk of a criminal prosecution or an action for recovery of damages."

See *Redgate v. Roush*, 61 Kan. 480, 59 P. 1050 (1900) ("The defamatory statement was not absolutely privileged, as words spoken or written by judges, jurors, or witnesses in the course of judicial proceedings, or as in legislative debates, but it was, at most a case of qualified privilege.").

Returning to Harcsar's "quasi-judicial proceeding" argument, this court notes that Black's Law Dictionary 849 (6th ed. 1990) defines a "judicial proceeding" as follows: "Any proceeding wherein judicial action is invoked and taken . . . . Any proceeding to obtain such remedy as the law allows . . . . A proceeding in a legally constituted court." These definitions all describe secular, non-ecclesiastical, proceedings. Because Harcsar's "quasi-judicial proceeding" occurred in an ecclesiastical setting and because the occasions for absolute privilege are limited by court precedent, this court determines that Harcsar's absolute privilege argument fails.

Harcsar and the Archdiocese also advance several other arguments for the dismissal of this action. This court determines that their argument under the Establishment Clause requires the dismissal of this action. The judicial resolution of this defamation ac-

tion would inexorably entangle the civil courts in an attempt to interpret canon law in violation of the First Amendment of the United States Constitution.

*Establishment Clause*

There are three main concerns against which the Establishment Clause sought to protect: "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz*, 397 U.S. at 668. There are three tests that a law must pass if it is challenged under the Establishment Clause: (1) the statute must have a secular legislative purpose; (2) the statute's primary effect must be one that neither advances nor inhibits religion; and (3) the statute must not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971).

In *Lemon*, the Court determined that excessive government entanglement with church-related schools would occur. This entanglement was found to inhere in state laws providing for payment of part of the salaries of teachers in parochial schools. The laws were held invalid even though their operation was limited to teachers of secular subjects. The Court reasoned that to ensure enforcement of the limitation, there would have to be excessive entanglement arising from the state's power of continuing surveillance to determine if the limitation was obeyed. 403 U.S. at 614.

*No Excessive Government Entanglement with Religion*

An excessive entanglement in violation of the Establishment Clause can occur when states or civil courts are required to interpret and evaluate church doctrine. If civil courts can resolve the issues by "neutral principles of law" by applying rules or standards without inquiry into religious doctrine, there is no entanglement problem. *Jones v. Wolf*, 443 U.S. 595, 602-04, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979).

To determine whether the Establishment Clause prohibits the civil courts from exercising jurisdiction over this matter, this court must consider the specific elements of Purdum's claim. In other words, this court must determine the nature and extent of the doctrinal relevance involved in the dispute.

Purdum bases his suit on a letter that Harcsar wrote to the Archdiocese asking for an annulment of her marriage to Purdum. Paragraph 9 of Purdum's first amended petition states that the letter "contained several false and damaging statements of fact about Plaintiff's behavior and psychological state, including but not limited to an assertion that Plaintiff 'was diagnosed as bipolar.' "

As stated earlier, Harcsar's petition for annulment was published solely to the Archdiocesan Tribunal in an ecclesiastical context. In that respect, the petition for annulment supplied the basis for Harcsar's initiation of annulment proceedings against Purdum under canon law. The Catholic Church does not permit divorce and remarriage. The Catholic Church will allow a later marriage when an annulment, which is also known as a "declaration of invalidity," is granted for any previous marriage. Thus, Harcsar's petition for annulment was used to invoke the church's jurisdiction to determine if the defects, if any, in her marriage justified an ecclesiastical declaration of invalidity. Indeed, Purdum's notice of Harcsar's petition for annulment, which included the alleged defamatory statements, is grounded upon religious doctrine. Moreover, Harcsar's petition for annulment inextricably became part of the Archdiocesan Tribunal, within its ecclesiastical procedure.

Essentially, Purdum's contentions allege that the alleged defamatory statements made by Harcsar can be "evaluated solely by the application of neutral principles of law and do not implicate matters of religious doctrine and practice." This court disagrees. For example, Harcsar claims an absolute privilege, which this court briefly discussed earlier, and, in the alternative, a qualified privilege to the alleged defamatory communication. In addition, Harcsar has raised, in her responsive pleadings, a defense of consent to her allegedly defamatory statements. The very nature of Harcsar's defenses and Purdum's defamation action will entangle the civil courts in the details of the administration and procedures of the Archdiocese's annulment proceedings. To illustrate, Purdum, at the trial court level, sought discovery from the Archdiocese for the following documents:

"1. Any and all correspondence and documents exchanged by you or the Archdiocese of Kansas City in Kansas ('Archdiocese') and Stephen Purdum in connection with his marriage case (the 'Marriage Case').

"2. Any and all correspondence and documents exchanged by you or the Archdiocese and Katy Purdum in connection with the Marriage Case.
"3. Any and all correspondence and documents exchanged by you or the Archdiocese and any third party or witness in connection with the Marriage Case.
"4. The file created by you or the Archdiocese in connection with the Marriage Case."

This requested discovery alone will entangle the civil courts in the administration of the Archdiocese's annulment proceedings. Moreover, there is no way for Purdum to prove his defamation action against Harcsar without excessive entanglement between the civil courts and the Archdiocese. For instance, Purdum conceded to the trial court that the only defamatory publication allegedly made by Harcsar was made to the Archdiocesan Tribunal:

"THE COURT: His claim is that he received this publication or that it was given to the church?

"[PLAINTIFF'S ATTORNEY]: Well, he received the publication, and it was published to the Archdiocese.

"THE COURT: Not the parishioners, but to the hierarchy?

"[PLAINTIFF'S ATTORNEY]: Right. And I believe that there may have been witnesses to the Archdiocese proceeding. But within the Archdiocese proceeding, not to the parishioners at large.

"THE COURT: Which he knows about because he received his notice as part of the church process which he at least impliedly knows exists because he signs on to the process, submits to the marriage in the church?

"[PLAINTIFF'S ATTORNEY]: It was a Catholic marriage.

"THE COURT: So his main complaint arises from him being notified. Otherwise he would have never known anything about the process.

"[PLAINTIFF'S ATTORNEY]: Well, that was how he received notice, but the publication at issue wouldn't be the publication to him."

Moreover, Purdum's first amended petition makes no allegation that Harcsar repeated her allegedly defamatory statements to any other persons or in any other forum except to the Archdiocese. Thus, there is no claim that Harcsar disseminated the defamatory statements outside the Catholic Church.

As stated previously, Harcsar's petition for annulment is inextricably part of the Archdiocesan Tribunal. Purdum's suit would require discovery and depositions of employees of the Archdiocese and would require the civil courts to interpret canon law concerning Harcsar's consent defense. For instance, the consent to submit

to the discipline or authority of the church, sect, or congregation is one of contract; therefore, it is between the person who has given his or her consent and the religious body. *Rosicrucian Fellow. v. Rosicrucian Etc. Ch.*, 39 Cal. 2d 121, 132, 245 P.2d 481 (1952). Determining whether Harcsar's consent defense is valid and proper would clearly involve the courts in questions of religious doctrine. Thus, adjudication of Harcsar's consent defense would entail judicial intrusion into a matter that the Catholic Church is entitled to decide, free from government intrusion.

There is no doubt that the First Amendment offers no protection to religious worshipers who make slanderous or libelous statements outside ecclesiastical tribunals, but that is not the case here. Harcsar asked for an annulment in a church forum as part of a church-approved, church-defined, and church-controlled process where the church would determine the validity of the church's marriage sacrament. There is no evidence that she took any action against Purdum outside the Archdiocesan Tribunal. Purdum's defamation action involves an ecclesiastical subject matter, and adjudication of it would entangle the civil courts in a church matter.

The First Amendment to the United States Constitution gives to churches freedom in managing their affairs in accordance with their own internal law and procedure, free from civil courts and governmental intervention:

"The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728-29, 20 L. Ed. 666 (1871).

Although *Watson* was based on federal common law, the United States Supreme Court has expressly applied *Watson* to the first Amendment. *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S.

696, 710, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976); see also *King v. Smith*, 106 Kan. 624, 89 P. 89 147 (1920).

To avoid paying damages to Purdum, Harcsar would have to prove in the civil courts that the statements she made in her petition for annulment were true. Moreover, if Harcsar relies on the defense of qualified privilege, she has the initial burden of establishing a prima facie case of qualified privilege. "A qualified privileged publication is one made on occasion which furnishes a prima facie legal excuse for making it unless additional facts are shown which alter the character of the publication." *Munsell v. Ideal Food Stores*, 208 Kan. 909, 920, 494 P.2d 1063 (1972). As a result, Harcsar would have to show that the statements she made in her petition for annulment were "made in good faith, without malice, and with reasonable or probable grounds for believing them to be true." 208 Kan. at 920-21.

How can the civil courts—and perhaps a jury—determine if the statements Harcsar made in her petition for annulment were "made in good faith, without malice, and with reasonable or probable grounds for believing them to be true" without entangling itself in the religious sincerity and conscience of Harcsar? The resolution of these factual disputes would require the courts to inquire into religious practices. Moreover, how can the civil courts—and perhaps a jury—consider Harcsar's consent defense without entangling itself in the details of the administration and procedures of the Archdiocese's annulment proceedings? Indeed, Harcsar's consent defense would require the civil courts to interpret canon law. This is the sort of entanglement that the Establishment Clause forbids. Thus, this court determines that the Establishment Clause under the First Amendment precludes jurisdiction over the subject matter of Purdum's defamation action. Although this court holds under a different ground than adopted by the trial court, this court determines that the trial court properly concluded that the First Amendment precluded its exercise of subject matter jurisdiction in this defamation action.

Because this court has affirmed the trial court's dismissal of this action, it is not necessary for this court to address the Archdiocese's motion to intervene and Church autonomy doctrine issues.

Affirmed.

* * *

BRUNS, J., concurring: I concur in the majority opinion but write separately to explain why I believe the church autonomy doctrine—also known as ecclesiastical abstention—is applicable in this case. Undoubtedly, this is a difficult question and I sincerely respect the opinions expressed by both of my colleagues. Nevertheless, I believe that under the unique facts presented in this defamation case—which arises out of an annulment proceeding filed in the Roman Catholic Church—we must decline to exercise subject matter jurisdiction out of respect for church autonomy. To do otherwise would excessively entangle the court in matters of church doctrine and practice.

### Standard of Review

The procedure used by the district court to dismiss this case for lack of subject matter jurisdiction was unusual. But I do not find the dismissal to be premature. Although Harscar filed a motion to dismiss, and the Archdiocese filed a proposed motion to dismiss, it appears that the district court did not rule on either of these motions. Rather, the district court ruled *sua sponte*—evidently pursuant to K.S.A. 60-212(b)(1)—that it lacked subject matter jurisdiction over the defamation claim. Specifically, the district court concluded that it would be inappropriate under the First Amendment to "require individuals to defend themselves in civil court for statements made during required religious proceedings, even if the statements are later determined to be true."

"Subject matter jurisdiction is vested by statute or constitution and establishes the court's authority to hear and decide a particular type of action." *Chelf v. State*, 46 Kan. App. 2d 522, Syl. ¶ 3, 263 P.3d 852 (2011). "If a trial court determines that it lacks subject matter jurisdiction, it has absolutely no authority to reach the merits of the case and is required as a matter of law to dismiss it." 46 Kan. App. 2d 522, Syl. ¶ 3. "The question as to whether subject matter jurisdiction exists is a question of law over which this court's scope of review is unlimited." *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, Syl. ¶ 2, 204 P.3d 562 (2009). Moreover, "a court

should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings." *University of South Alabama v. Am. Tobacco,* 168 F.3d 405, 410 (11th Cir. 1999).

Although the issue has not been addressed in Kansas, several jurisdictions have held that the ecclesiastical abstention doctrine involves subject matter jurisdiction. See *State v. Young,* 974 So. 2d 601, 612 (Fla. Dist. App. 2008) ("[T]he ecclesiastical abstention doctrine is an issue of subject-matter jurisdiction . . . ."); *Patton v. Jones,* 212 S.W.3d 541, 547-48 (Tex. App. 2006) ("In cases relying on the ecclesiastical abstention doctrine, courts consider the substance and nature of the plaintiff's claims to determine whether the First Amendment prevents subject matter jurisdiction."); *Ogle v. Church of God,* 153 Fed. Appx. 371, 376 (6th Cir. 2005) ("The district court was correct in holding that this case falls squarely within the class of cases for which the courts lack subject matter jurisdiction as a matter of First Amendment law."). At the very least, when abstention is warranted, a court declines to exercise its subject matter jurisdiction. See *Carlsbad Technology, Inc. v. HIF Bio, Inc.,* 556 U.S. 635, 639, 129 S. Ct. 1862, 173 L. Ed. 2d 843 (2009). Thus, I believe the question of whether a court should invoke the ecclesiastical abstention doctrine—like the question of subject matter jurisdiction—should be addressed at the earliest possible stage in the proceedings.

*Church Autonomy and Ecclesiastical Abstention*

The First Amendment to the United States Constitution provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Similarly, Section 7 of the Kansas Constitution Bill of Rights states, in part, that "[t]he right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of or interference with the rights of conscience be permitted . . . ." All three branches of government are to protect these fundamental constitutional rights. See *Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 191, 80 S. Ct. 1037, 4 L. Ed. 2d 1140 (1960).

Hierarchical religious organizations have the right " 'to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters.' " *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. ___, 132 S. Ct. 694, 705, 181 L. Ed. 2d 650 (2012) (quoting *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724, 96 S. Ct. 2372, 49 L. Ed. 2d 151 [1976]). "Civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." 426 U.S. at 713. Furthermore, civil courts are prohibited by the First Amendment from making " 'inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or [into] the substantive criteria by which they are supposedly to decide the ecclesiastical question.' " 426 U.S. at 713.

As this court has recognized, "[t]he jurisdiction of civil courts to address matters involving church affairs is limited." *Church of God in Christ, Inc. v. Board of Trustees*, 47 Kan. App. 2d 674, Syl. ¶ 4, 280 P.3d 795 (2012). This jurisdictional limitation is necessary because religious organizations must have the " 'power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' " *Hosanna-Tabor*, 132 S. Ct. at 704 (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed 120 [1952]). Accordingly, "[p]urely theological questions and matters ecclesiastical in character must be determined by the authorities of the particular church involved." 47 Kan. App. 2d 674, Syl. ¶ 5.

In some instances, it is clear that secular courts must yield subject matter jurisdiction to ecclesiastical tribunals. For example, secular courts do not have the authority to determine matters relating to the selection of ministers. See *Hosanna-Tabor*, 132 S. Ct. at 706. Likewise, secular courts are to yield to ecclesiastical tribunals "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by . . . church judicatories . . . ." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 20 L. Ed. 666 (1871). On the other hand, when church-related controversies in-

volve primarily civil or property rights, secular courts will ordinarily exercise jurisdiction to decide the merits of the case to assure regularity of business practices and to protect private property rights. See *Church of God in Christ*, 47 Kan. App. 2d 674, Syl. ¶ 6. In yet other cases, as here, the answer is not so clear.

### *Application of Church Autonomy and Ecclesiastical Abstention*

Certainly, a defamation claim is a civil cause of action that falls within the general jurisdiction of state courts. But the allegation of defamation in this case arises entirely out of an ecclesiastical proceeding. Specifically, Harscar included the alleged defamatory statement in a pleading she filed with a tribunal of the Roman Catholic Church. Moreover, neither party disputes that the purpose of the tribunal is to determine the validity of a "sacramental marriage" based solely on canon law. Further, neither party disputes that Harscar only published the allegedly defamatory statement—to the Archdiocese and to the parties—within the context of the annulment proceeding. Thus, matters ecclesiastical in character were intertwined in this defamation case from its very inception.

Both Purdum and Harscar consented to the jurisdiction of the Roman Catholic Church regarding the validity of their sacramental marriage. In fact, Purdum's counsel represented to the district court that "we don't contest that [the parties] were married in a Catholic marriage, and we certainly don't contest the jurisdiction of the Catholic Church to determine the annulment." Nevertheless, Purdum went on to argue that because he is not a member of the Roman Catholic Church, he has the right to bring his "defamation claim in Kansas state court." But this does not change the fact that he has agreed to the church's jurisdiction over the sacramental side of his marriage to Harscar—he consented to the church's authority to determine his marital status within the church. Because Purdum consented to the very proceeding in which the defamation claim arose, I believe the issue of consent is relevant to our examination of the issue of church autonomy and ecclesiastical abstention. This is true regardless of its possible relevance as a separate defense to the defamation claim.

Purdum has agreed that the affidavits attached to the motions filed in the district court by the Archdiocese "are admissible evidence for the Court to consider [in resolving] the issue of subject matter jurisdiction." These affidavits, and the accompanying documents, confirm that an annulment in the Roman Catholic Church deals only with the religious or spiritual side of the marriage. It has nothing to do with the legal or civil side of the marriage. If the Roman Catholic Church grants an annulment, it is simply a declaration that the marriage is invalid in the eyes of the church. Such a declaration of invalidity, however, does not impact any civil obligations arising out of the marriage. Unlike a divorce or similar action in civil or secular courts, an annulment looks at the marriage entirely from the perspective of church doctrine and canon law.

If a prior marriage does not end in the death of one of the spouses, a spouse must complete an annulment or similar procedure before entering a new marriage in the Roman Catholic Church or receiving its sacraments. The burden of proof in an ecclesiastical annulment proceeding rests on the petitioner, and he or she must present sufficient grounds to obtain a declaration of invalidity. In addition, notification to the respondent is an essential element of an annulment proceeding in order to give both parties the opportunity to participate in the fact-finding process.

Indeed, a witness questionnaire sent to Purdum as part of the notice of the commencement of the ecclesiastical annulment proceeding stated: "The purpose of our investigation is to determine the *status of the parties in the eyes of the Roman Catholic Church* . . . ." Moreover, the petition filed by Purdum in this case does not allege that anyone other than the parties and the Roman Catholic Church saw the allegedly defamatory statement made by Harscar in the ecclesiastical annulment proceeding. Thus, the question in this case is whether secular courts should abstain from exercising subject matter jurisdiction over a defamation claim where the statement alleged to have been defamatory was made solely within the context of an ecclesiastical proceeding consented to by all parties.

Although defamation laws may be neutral, a secular court is not free to entangle itself in matters pending before an ecclesiastical tribunal simply because the court might resolve the issue without

resorting to religious doctrine. For example, in *Hosanna-Tabor*, the employment disability law that was allegedly violated was neutral in that it generally applied to all employers—both ecclesiastical or secular. See *Hosanna-Tabor*, 132 S. Ct. at 701, 709. But in recognizing a ministerial exception to the law, the United States Supreme Court found that "[t]he purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' [citation omitted]—is the church's alone." *Hosanna-Tabor*, 132 S. Ct. at 709. In other words, a church could terminate a minister—even for a reason that violated secular law—so as to ensure the right of ecclesiastical tribunals to remain autonomous.

While the present case does not involve the selection or dismissal of a minister, it involves a proceeding to determine the validity of a sacramental marriage within the Roman Catholic Church—a matter that is also strictly ecclesiastical. Regardless of whether the alleged defamatory statement was true or not, Harscar made it only to the ecclesiastical tribunal. That tribunal, in turn, shared it with Purdum as a regular part of the Roman Catholic Church's procedure in an action to determine the validity of a sacramental marriage.

In order for authorities within the Roman Catholic Church to perform their duties in an ecclesiastical annulment proceeding, I believe it is imperative that the parties be free to allege their version of the facts with candor and without fear of being sued in secular courts. See *Cimijotti v. Paulsen*, 230 F. Supp. 39, 41 (N.D. Iowa 1964) ("The freedom of speech does not protect one against slander, yet a person must be free to say anything and everything to his Church, at least so long as it is said in a recognized and required proceeding of the religion and to a recognized official of the religion."), *aff'd* 340 F.2d 613 (8th Cir. 1965). Accordingly, I believe it is appropriate for secular courts to invoke the ecclesiastical abstention doctrine to protect communications made solely within the context of a proceeding pending before an ecclesiastical tribunal.

In summary, the sole purpose of an ecclesiastical annulment proceeding is to determine the validity of a sacramental marriage within the Roman Catholic Church and it has no impact on the status of a civil marriage. To allow a claim to go forward based on an alleged defamatory statement made solely in the context of an ecclesiastical annulment proceeding would have a chilling effect on the ability of the Roman Catholic Church to investigate and determine the validity of such marriages within the church. Thus, because the alleged defamatory statement in this case arises completely within the context of a consented-to ecclesiastical proceeding, we must respect church autonomy by exercising ecclesiastical abstention.

\* \* \*

ATCHESON, J., dissenting: Plaintiff Stephen E. Purdum sued Defendant Katherine C. Harcsar, his former wife, for defamation. The case has taken a detour into the legal ramifications of the Free Exercise Clause of the First Amendment, insulating religious beliefs and practices, because Harcsar made the allegedly libelous statement in a request to the Archdiocese of Kansas City in Kansas for an annulment of their marriage. The Archdiocese sought to intervene in the Johnson County District Court proceedings and asked that the suit be dismissed. Without reaching the merits of the defamation claim and before any discovery had been done, the district court ruled the Free Exercise Clause creates an absolute privilege or immunity for Harcsar's statement, borrowing one of the Archdiocese's arguments. The district court erred in recognizing such a constitutional protection and dismissing Purdum's suit.

The Archdiocese also urged the district court to dismiss the suit in keeping with the recognized constitutional principles of church autonomy that shield religious organizations, their officials, and their congregants from judicial review of disputes bound up with matters of faith, ecclesiastical doctrine, or the selection of spiritual leaders. The district court correctly declined to apply those principles in the manner the Archdiocese requested because the allegedly defamatory statement is secular in nature and Purdum does not challenge the Catholic Church's authority to consider or grant the annulment.

That is how the case came to this court, presenting two substantive issues—the district court's ill-conceived absolute privilege and the Archdiocese's argument for broad application of church autonomy to bar Purdum's suit simply because it has some general association with a religious proceeding. On those issues and the limited evidentiary record, this court ought to reverse and remand for further proceedings. Neither the Free Exercise Clause nor the Establishment Clause of the First Amendment to the United States Constitution supports an absolute privilege of the kind the district court recognized. Similarly, the church autonomy doctrine has not been applied to bar litigation merely having a factual connection to a church or religion when a court may resolve the legal dispute without passing on the validity of ecclesiastical doctrine or beliefs or the selection of spiritual leaders. I, therefore, respectfully dissent from my colleagues' views that the judgment dismissing the suit ought to be affirmed.

Judge Green reaches out to affirm the district court based on consent—an issue that has never been briefed or argued by any of the parties on appeal or below. Judge Green posits that because Purdum consented to a sacramental marriage within the Catholic faith and, presumably, to its annulment, this suit cannot go forward. He suggests sorting out the scope of Purdum's consent would impermissibly entangle the courts in an issue of church doctrine, thereby violating the religion clauses. He also suggests consent would be a defense to a libel action under accepted principles of defamation law. Whatever the worth of those theories, neither Harcsar nor the Archdiocese has argued them to this point. And Purdum has never had a chance to respond to them. If this case were remanded, as it should be on the issues actually presented, the parties would be free to join and fully litigate consent in the district court. I decline to join in Judge Green's rush to judgment.

Judge Bruns seems to combine consent with absolute privilege to conclude Purdum's suit was properly dismissed and, thus, concurs in affirming the judgment below. His opinion, thus, rests on a yet-to-be-argued issue (consent) and a legally unfounded one (absolute privilege). I cannot join in that approach either.

In the balance of this dissent, I outline the factual and procedural history of the case. I then explain why the district court's reliance on absolute privilege has no constitutional foundation in religion clauses of the First Amendment and is, therefore, erroneous. Next, I address the argument the Archdiocese actually has presented for dismissal based on the church autonomy doctrine and discuss how that position would substantially and impermissibly expand the doctrine. Finally, I elaborate on why the judgment of dismissal should not be affirmed based on the reasons my colleagues advance.

I do agree with Judge Bruns that the fundamental issue in this case—whether Harcsar has committed an actionable libel of Purdum—is a challenging one. The parties and the district court have never gotten to a host of intriguing questions of defamation law wholly unrelated to the religious character of the forum in which the statement was published. The circumstances of the publication, however, open up another set of exceptionally difficult questions dependent on the constitutional protections afforded religious beliefs and practices. Only a couple of those questions have been presented to us, and we cannot venture beyond them in fashioning our answers in this appeal. We mustn't turn to defenses not yet presented and argued in our effort to meet the challenges of this case.

In sum, the case should be returned to the district court to travel the usual path of civil litigation to discovery, dispositive motions, and, if necessary, trial. On a fully developed factual record, Harcsar might prevail on consent, church autonomy, or some other defense whether on a renewed motion to dismiss, summary judgment, or at trial. Nothing I suggest would preclude those outcomes. But dismissing the case now cannot be legally justified.

## FACTUAL AND PROCEDURAL HISTORY

The district court dismissed Purdum's amended petition against Harcsar for lack of subject matter jurisdiction, as provided in K.S.A. 2012 Supp. 60-212(b)(1), based on its mistaken conclusion that an absolute privilege attached to Harcsar's statement. The procedural posture of the case both in the district court and here is odd be-

cause of the presence of the Archdiocese—it appeared in the district court as an invited *amicus curiae*, but the district court denied its motion to intervene as a party. The oddity, however, does not really affect the issues on appeal. And given the majority's decision to affirm, the Archdiocese's appeal of the intervention ruling is moot, so I have nothing further to say about it.

The district court dismissed the case before any discovery had been done. The factual basis for its ruling was drawn, in part, from a motion the Archdiocese filed, with supporting affidavits, suggesting the lack of subject matter jurisdiction and, in part, from the amended petition. The parties did not dispute the material facts upon which the district court relied in dismissing the case. Nor do they dispute those factual assertions for purposes of this appeal. I necessarily base my assessment of the legal issues on that limited record.

Purdum and Harcsar were married on April 25, 1993, in New Jersey. This case is captioned as *Purdum v. Purdum*, suggesting Harcsar took her ex-husband's surname when they married. But the briefing uses the surname Harcsar; all of us have done so too. Harcsar was and remains a devout Catholic. Purdum is Lutheran. Their marriage was performed according to the rituals of the Catholic Church and was considered sacramental. Purdum filed for divorce in Johnson County in late 2001, and the divorce was granted about 6 years later. Harcsar apparently wished to remarry in a Catholic ceremony. To do so, she needed to obtain an annulment of her marriage to Purdum from the Catholic Church. If granted, an annulment effectively invalidates a marriage so far as the Catholic Church is concerned.

In February 2009, Harcsar filed a petition for annulment with the Archdiocesan Tribunal for the Archdiocese of Kansas City in Kansas. As provided in the rules for the Tribunal, the Archdiocese sent a copy of the petition to Purdum and informed him that he could participate in the annulment proceeding if he so chose. Persons affiliated with the Archdiocese read the petition in connection with the annulment process. The petition and the process are to be confidential. Only church officials directly involved in that process should be privy to the information in the petition.

In his civil suit, Purdum alleged statements Harcsar made about him in the annulment petition to be false and defamatory. His amended petition described briefly the nature of the alleged defamation as an assertion that he had been "diagnosed as bipolar" and as otherwise referring to his mental health in some way. The suit contends Harcsar knew those statements to be false. The suit does not contend the statements were published or communicated outside of the annulment process. As described in the amended petition, the challenged statement concerned a purely secular matter and had nothing to do with Purdum's piety or his religious beliefs or practices. Purdum sued only Harcsar on a theory of libel or defamation. The amended petition made no claim against the Archdiocese or any of its employees, agents, or members of the Tribunal. Nor did it seek to block or otherwise interfere with the annulment. Based on the representations of counsel at oral argument, I understand the annulment to have been granted.

At this juncture, the parties do not dispute the sufficiency of the amended petition in stating a claim for defamation. That is, Harcsar has yet to argue defenses grounded in defamation law. The district court did not rule on any defamation defenses, and nothing in appellate briefing touches on them. In her answer, Harcsar asserted consent as an affirmative defense. She has, thus, preserved the issue. But, as I indicated, the parties have not joined or argued consent in the district court or on appeal.

With the agreement of Purdum and Harcsar, the district court invited the Archdiocese to appear in the case as *amicus curiae* because the dispute arose out of an annulment of a church sanctified marriage. The Archdiocese filed papers in that capacity urging dismissal of the suit based on privilege and church autonomy. The Archdiocese then moved to intervene as a party as a matter of right under K.S.A. 2012 Supp. 60-224(a)(2). As an exhibit to the request to intervene, the Archdiocese submitted a motion to dismiss Purdum's suit for lack of subject matter jurisdiction focusing on the church autonomy doctrine.

The district court ultimately denied the Archdiocese's request to intervene but ruled on the substantive arguments the Archdiocese had advanced for dismissing Purdum's suit. In a memorandum

decision filed April 11, 2011, the district court found the Archdiocese's arguments for church autonomy did not warrant dismissal. But the district court ruled that the Free Exercise Clause of the First Amendment afforded Harcsar an absolute privilege or immunity from suit for communications made during "religious proceedings." The district court cited only *Cimijotti v. Paulsen*, 230 F. Supp. 39, 41 (N.D. Iowa 1964), *aff'd* 340 F.2d 613 (8th Cir. 1965), in support of such a privilege and held it cut off subject matter jurisdiction for Purdum's suit. The district court, therefore, dismissed the action.

Purdum timely filed a notice of appeal. On the same day, the Archdiocese filed its own notice of appeal challenging the district court's denial of its motion to intervene and rejection of church autonomy as a basis for dismissing the suit. Harcsar joined in the appeal. The Archdiocese filed a lengthy brief with this court principally addressing what it perceived as the district court's errors in rejecting church autonomy as an alternative ground for dismissal of the suit and in denying its motion to intervene. On appeal, Harcsar filed a short brief joining in the Archdiocese's arguments and advancing no independent arguments for affirming the dismissal.

## LEGAL ANALYSIS

1. *Introduction: Defining the issues and setting the standards of review.*

Apart from intervention, now moot given my colleagues' decision to affirm dismissal, this appeal presents two substantive issues. First, did the district court correctly find an absolute privilege arising from the Free Exercise Clause? If not, has the Archdiocese articulated a sound basis for extending the church autonomy doctrine to Purdum's suit? I address those issues before turning to a more detailed explanation of why I cannot join in the opinions my colleagues have advanced for affirming dismissal. I reiterate that the parties, to this point, have not briefed or argued Purdum's purported consent either as a general defense to the libel claim or as a basis for applying the church autonomy doctrine to dismiss the suit.

Because the material facts pertaining to the issues actually argued are undisputed, those issues present questions of law that this court reviews anew and without deference to the ruling below. *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 258-59, 261 P.3d 943 (2011); *Chesbro v. Board of Douglas County Comm'rs*, 39 Kan. App. 2d 954, 960, 186 P.3d 829 (Even what is commonly an issue of fact may be determined as a question of law when the material evidence is undisputed.), *rev. denied* 286 Kan. 1176 (2008).

2. *The district court erred in finding the Free Exercise Clause conferred an absolute privilege against legal liability.*

The district court dismissed Purdum's suit on the theory that Harcsar's communication to the Archdiocese in her petition for annulment enjoys an absolute privilege arising from the Free Exercise Clause of the First Amendment. That construction of the Free Exercise Clause cannot be reconciled with governing United States Supreme Court precedent. Before turning to that law, I note that the First Amendment applies here, even though the suit and the underlying dispute concern only private parties. The parties do not argue otherwise.

Both the Free Exercise and Establishment Clauses have been incorporated through the Due Process Clause of the Fourteenth Amendment and, therefore, limit state action. *Cantwell v. Connecticut*, 310 U.S. 296, 303-04, 60 S. Ct. 900, 84 L. Ed. 1213 (1940); see *Duncan v. Louisiana*, 391 U.S. 145, 148, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968) ("[M]any of the rights guaranteed by the first eight Amendments to the Constitution have been held to be protected against state action by the Due Process Clause of the Fourteenth Amendment."). That is, the First Amendment, as incorporated, checks the actions of state and municipal governments impermissibly imperiling those liberties.

Although this suit rests on a common-law cause of action, rather than a legislative enactment, and involves a legal dispute between private parties, rather than an individual and a governmental entity or actor, there is sufficient state involvement to trigger those constitutional limitations. Use of the state courts to vindicate a com-

mon law or judicially recognized right, such as libel or contract, is enough. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 265, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (incorporated First Amendment protections of speech and press implicated in state court libel action because "the Alabama courts have applied a state rule of law [and] . . . [i]t matters not that that law has been applied in a civil action [between private parties] and that it is common law only"); *Shelley v. Kraemer*, 334 U.S. 1, 15, 68 S. Ct. 836, 92 L. Ed. 1161 (1948) ("[J]udicial action is to be regarded as action on the State for purposes of the Fourteenth Amendment" so a suit between private parties to enforce a racially restrictive covenant in a deed triggers rights secured through that amendment.); *Bollard v. California Province of Soc. of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999) (state law claims, including breach of contract, brought by novice in Jesuit order against his superiors precluded by Free Exercise Clause); *Lewis v. Seventh Day Adventists Lake Region Conf.*, 978 F.2d 940, 942 (6th Cir. 1992) ("[C]ivil court jurisdiction over a ministerial employment dispute was impermissible because such state intervention would excessively inhibit religious liberty," contrary to the Free Exercise Clause.); *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1576-77 (1st Cir. 1989) (court affirms dismissal of cleric's wrongful termination suit because religion clauses of the First Amendment preclude intrusion upon matters of church canon and leadership). Accordingly, the Archdiocese may premise arguments on the religion clauses to the extent they substantively affect this legal dispute, since the requisite state action to invoke them at all exists.

The Free Exercise Clause substantially limits government action that discriminates based on religious tenets or "regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993). Thus, "a law targeting religious beliefs as such is never permissible." 508 U.S. at 533. In other words, the government may not prohibit persons from holding particular religious beliefs, compel affirmation of prescribed religious beliefs, punish religious doctrine as false, or takes sides in disputes over religious authority or dogma. *Employ-*

*ment Div., Ore. Dept. of Human Res. v. Smith*, 494 U.S. 872, 877, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). But the Free Exercise Clause does not negate the enforcement "of a neutral, generally applicable law to religiously motivated action." *Watchtower Bible & Tract Soc. of N. Y., Inc. v. Village of Stratton*, 536 U.S. 150, 159 n.8, 122 S. Ct. 2080, 153 L. Ed. 2d 205 (2002); *Smith*, 494 U.S. at 879. The Court's "decisions have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. at 879. A neutral and generally applicable law will be enforced if it is rationally related to a governmental purpose and incidentally impairs a religious practice. See 494 U.S. at 878 ("[I]f prohibiting the exercise of religion is not the object of . . . but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended."); 494 U.S. at 886 n.3 (no compelling governmental interest required to support law); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1255 n.21 (11th Cir. 2012) (rational basis sufficient to deflect Free Exercise challenge to neutral, generally applicable law); *Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 210 -12 (2d Cir. 2012) (recognizing and applying those principles, including rational basis review); *Brown v. City of Pittsburgh*, 586 F.3d 263, 284 (3d Cir. · 2009) (recognizing rational basis review).

A law is not considered neutral "if [its] object is to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye*, 508 U.S. at 533. A law that purposefully inhibits religious practices may still be enforced if it furthers a compelling government interest and is "narrowly tailored" to promoting that interest. *Church of the Lukumi Babalu Aye*, 508 U.S. at 533.

In the United States Supreme Court's view, the Free Exercise Clause permits enforcement of neutral laws limiting or prohibiting particular activities even when those activities have been undertaken for religious reasons, thereby undercutting the argument for an absolute privilege grounded in the Clause. The sweeping pro-

tection of absolute privilege necessarily conflicts with the application of neutral laws to religious activity in any fashion. If those laws may be applied, even in some muted way, any residual protection for the affected religious activity cannot be absolute.

Purdum seeks to enforce a common-law cause of action remedying libel or defamation. For purposes of the Free Exercise Clause, the cause of action must be considered neutral and generally applicable. Arguing otherwise would be futile. The common law of defamation does not somehow treat allegedly actionable statements made as part of a religious practice or church sanctioned activity less favorably than other statements, as by diminishing the plaintiff's burden of proof or enhancing recoverable damages. See *Black v. Snyder*, 471 N.W.2d 715, 719 (Minn. App. 1991) (noting Minnesota's common law of defamation to be "content neutral" with respect to religion). Defamation law serves valid public policy interests in providing a person a socially responsible vehicle to vindicate his or her reputation against a falsely besmirching statement. See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341-42, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) (acknowledging the "legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted upon them by defamatory falsehood" and recognizing that interest must be balanced against "the need for a vigorous and uninhibited press"); *Linn v. Plant Guard Workers*, 383 U.S. 53, 63-64 & n.6, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966) (noting both the historical importance of libel law and the utility of the cause of action in deterring violent self-help remedies); *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 5-6, 649 P.2d 1239 (1982). Nothing inherent in defamation law would prohibit the Catholic Church from granting annulments. Purdum has not sought to keep the Archdiocese from acting on Harcsar's request. He did not sue the Catholic Church and could not obtain that sort of injunctive relief (or any relief for that matter) against it. Indeed, Harcsar has been granted an annulment. The burden on the annulment process, if any, appears incidental.

As I have noted, the district court cited and relied solely on a 50-year-old decision from a federal court in Iowa in finding an absolute privilege for Harcsar's allegedly defamatory statement.

*Cimijotti*, 230 F. Supp. at 41. The *Cimijotti* decision described an absolute privilege emanating from the Free Exercise Clause in two paragraphs of dicta and, in turn, cited no authority for its conclusion. Conspicuously missing in this case, too, is any supporting authority for the existence of that privilege.

Even standing alone, the *Cimijotti* decision, properly analyzed, provides only pallid support for an absolute privilege grounded in the Free Exercise Clause. In that case, Cimijotti sued his former wife and two other individuals for purportedly defamatory statements they made to priests or other officials within the Catholic Church to secure a church approved divorce. The case, then, is factually similar to this one. The federal judge found Cimijotti could not successfully sue his former wife because she acted while they were still married and Iowa recognized the doctrine of interspousal immunity barring tort actions between husband and wife. 230 F. Supp. at 41, 43. The judge found for the other two defendants on a statute of limitations defense. 230 F. Supp. at 42, 44.

As a backstop, the judge also opined that "a person must be free to say anything and everything to his Church, at least so long as it is said in a recognized and required proceeding of the religion and to a recognized official of the religion." 230 F. Supp. at 41. The decision cited no authority for that broad proposition. After mentioning the Free Exercise Clause without further elaboration, the judge concluded that "the statements made by the defendants under the circumstances of this case are absolutely privileged against an action for defamation." 230 F. Supp. at 42. Again, the opinion cited no authority. The two-paragraph discussion of constitutional doctrine in *Cimijotti* amounts to dicta. The decision clearly stated and relied on other grounds as wholly sufficient for dismissal. The judge's extraneous observation of an absolute privilege in the Free Exercise Clause appears to be a constitutional mirage, especially given the utter absence of supporting precedent or a fully developed rationale incorporating arguably analogous doctrine. Even as persuasive authority, *Cimijotti* underwhelms.

Both the judge in *Cimijotti* and the district court in this case allude to the need for confidentiality between a congregant and a cleric as a basis for recognizing a constitutionally based privilege

against suit. The district court here suggested: "As held by the *Cimijotti* court, an individual's right to engage in the free exercise of his or her religion is protected by the First Amendment; this is especially true when a penitent communicates with his or her minister." But that reasoning confuses constitutional protection of religious practices, which is not absolute, with the near universal evidentiary privilege prohibiting the disclosure of clergy-penitent communications. The evidentiary privilege rests on statutory enactment or common-law recognition rather than constitutional right. See *Varner v. Stovall*, 500 F.3d 491, 494-99 (6th Cir. 2007) (discussing origins and development of penitent privilege without suggesting a constitutional basis). That privilege serves a purpose different from the absolute privilege conjured in *Cimijotti*. The evidentiary privilege is not an immunity against suit. It permits a penitent or a cleric on the penitent's behalf to refuse to disclose protected communications made to discharge a moral obligation or to seek divine forgiveness for past conduct. K.S.A. 60-429. The evidentiary privilege extends to parties and witnesses to advance public policy objectives in maintaining confidentiality for communications essential to a relationship society deems worthy of protection. The same policies undergird evidentiary privileges for marital communications, physician-patient consultations, and attorney-client discussions, among others. The success of those relationships depends, at least in part, on candid communication between the participants, hence the protection against disclosing the content of that communication in a judicial proceeding. But the absolute privilege against suit suggested in *Cimijotti* fails of that purpose—it would shield only communications of defendants. Neither plaintiffs nor nonparty witnesses could benefit from a bar against suits, since they are not being sued. That substantial underinclusiveness offers another reason to suspect the absolute privilege of *Cimijotti* of being unsound constitutional doctrine.[1]

[1]The penitential communication privilege codified in K.S.A. 60-429 probably does not apply to the statements Harcsar included in her petition for an annulment. Assuming they otherwise qualified as a "penitential communication," the statements fail the statutory test because Harcsar could not have intended them to be "secret and confidential," since they were disclosed to Purdum as part of

the protocols for the annulment process. But communication to Purdum would not amount to actionable publication to support a defamation claim. Restatement (Second) of Torts § 577 (1976), comment b ("To constitute publication it is necessary that the defamatory matter be communicated to someone other than the person defamed."). Purdum's inability to bring suit based on disclosure to him would not preserve the evidentiary privilege, since the privilege depends upon on the penitent's expectation of confidentiality for the communication and not on whether the communication might be legally actionable on some theory if it were no longer confidential.

The Archdiocese devotes little attention in its appellate brief to the district court's absolute privilege rationale. Apart from *Cimijotti,* the Archdiocese points to one other case mentioning an absolute privilege against suit purportedly founded on the Free Exercise Clause, a mention that also amounted to dicta. *Stepek v. Doe,* 392 Ill. App. 3d 739, 752-53, 910 N.E.2d 655 (2009). The *Stepek* panel cited *Cimijotti* for the proposition and appears to have been the only appellate court to do so. 392 Ill. App. 3d at 752-53. Relying on *Cimijotti* alone, the *Stepek* decision offered no sound constitutional foundation for the privilege and used it as a secondary rationale for the outcome in that case. In *Stepek,* the court turned aside a defamation suit a Catholic priest filed against two brothers who had lodged charges of sexual abuse against him through internal church disciplinary processes, leading to an investigation and his punishment. The court dismissed the suit in reliance on church autonomy principles extending constitutional protection to decisions of religious organizations bound up with the selection and retention of spiritual leaders. 392 Ill. App. 3d at 746-47, 753, 756; see *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,* 565 U.S. ___, 132 S. Ct. 694, 706, 181 L. Ed. 2d 650 (2012) (Allowing the government to "impos[e] an unwanted minister . . . infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments."). The court found the priest's suit against his accusers to be an impermissible collateral attack on the Church's decision to discipline him. In doing so, the court repeatedly emphasized the singular importance of the church-cleric relationship and constitutional restraints on civil courts interfering even indirectly with institutional decisions regarding selection or

dismissal of spiritual leaders. *Stepek*, 392 Ill. App. 3d at 750 (defamation claim rests on statement made in internal disciplinary proceeding "touching the core of the church-minister relationship"); at 751. (basis of priest's defamation claim tied to his "fitness for ministry"). The court gives no indication that its rationale ought to be extended beyond those circumstances.

In *Smith*, decided nearly 25 years after *Cimijotti*, the United States Supreme Court doesn't so much as mention a Free Exercise Clause privilege—an omission that would be curious given the issue presented and the reasoning of the decision. The *Smith* decision pointed to longstanding Free Exercise Clause jurisprudence recognizing: " 'Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs.' " *Smith*, 494 U.S. at 879 (quoting *Minersville District v. Gobitis*, 310 U.S. 586, 594, 60 S. Ct. 1010, 84 L. Ed. 1375 [1940]). An absolute privilege of the sort described in *Cimijotti* and applied here would considerably curtail that rule, freeing individuals to disobey an array of general laws, including the common law of defamation, if they did so in the course of a religious ritual or practice. I would expect the *Smith* Court to at least acknowledge an absolute privilege and to explain, at least briefly, why it had no bearing there. I also would suppose some reference to such a privilege ought to turn up elsewhere in the Court's religion clauses precedent. But the panel has not been presented with that reference. Nor apparently have any of us independently discovered it.

In my view, the district court erred in holding the Free Exercise Clause enables an absolute privilege precluding Purdum's action against Harcsar. Judge Green rejects an absolute privilege as well. But that determination alone doesn't require remand because the Archdiocese has argued for dismissal of Purdum's suit based on the church autonomy doctrine. As an alternative basis for the outcome below that the parties have briefed, the argument should be addressed. I next turn to it.[2]

[2]On the matter of privilege, I mention in passing *Redgate v. Roush*, 61 Kan. 480, 59 P. 1050 (1900), which Purdum argued in the district court and has cited

on appeal. In that case, the Kansas Supreme Court held that a qualified privilege applied to statements leaders of a Wabaunsee County church published to their counterparts within the denomination about the reasons they dismissed their minister. 61 Kan. at 484-85. The minister sued them for libel. The court did not consider the Free Exercise Clause, since protections in the Bill of Rights had not yet been incorporated through the Fourteenth Amendment to apply in state judicial proceedings. Rather, the court relied on traditional defamation principles to hold that statements published in good faith in service of a private duty to the church community warranted a qualified privilege. 61 Kan. at 485. Whether Harcsar might be entitled to a qualified privilege under Kansas defamation law—something entirely distinct from the absolute privilege *Cimijotti* mistakenly derives from the Free Exercise Clause—is not before the panel. The parties never got around to briefing or arguing defamation law either in the district court or here. In addition, *Redgate* deals with the termination of a minister, a material factual difference. Under modern religion clause jurisprudence, the church autonomy doctrine has been construed to preclude suits related to the selection or retention of spiritual leaders. See *Hosanna-Tabor*, 132 S. Ct. at 704-06; *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 717-20, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976).

3. *Neither the church autonomy doctrine nor the related undue entanglement doctrine affords a basis for dismissing this defamation action.*

The Archdiocese advances the church autonomy doctrine and the allied undue entanglement doctrine as rules requiring dismissal of Purdum's defamation suit on its face. Those principles reflect recognized constitutional limits on governmental intrusion into theological philosophies and internal operations of religious organizations inextricably bound up with their teachings and their choices of who should impart those spiritual messages. They have roots in both religion clauses of the First Amendment in that governmental involvement, especially through the judicial process, in deciding issues entwined with a religious group's views of faith, divinity, redemption, and the like risks fostering establishment of a seemingly favored dogma or impairing the free exercise of disfavored dogma. But the Archdiocese has not sought to bolster its legal position based on Purdum's consent to a sacramental marriage within the Catholic Church. The district court found Purdum's libel claim neither contravened church autonomy nor caused an undue entanglement with religious practice as the Archdiocese

outlined those constitutional protections. So the district court relied on absolute privilege to dismiss the suit. On appeal, the Archdiocese hews to the same position, forgoing any defense based on consent. In response, Purdum primarily asserts that the Archdiocese has failed to show the applicability of church autonomy and undue entanglement to the defamation claim he has brought against Harcsar, especially given the substantive content of her statement and the absence of any direct impediment to the annulment process.

a. *Scope of doctrines*

The Establishment Clause and the Free Exercise Clause together construct a sphere of protection for religious organizations designed to keep government actors at some measurable distance to avoid affecting institutional decisions about what to believe and who may best inculcate those beliefs. *Hosanna-Taylor*, 132 S. Ct. at 704 (The Court's precedent " 'radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' " [quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952)]); *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976) (The First and Fourteenth Amendments preclude civil courts from reviewing and altering decision of ecclesiastic tribunals as to "religious issues of doctrine or polity."); *Church of God in Christ, Inc. v. Board of Trustees*, 47 Kan. App. 2d 674, 682-83, 280 P.3d 795 (2012). The constitutional protection for religious self-determination is often referred to as the church autonomy doctrine or the ecclesiastical abstention doctrine. *Rweyemamu v. Cote*, 520 F.3d 198, 205 (2d Cir. 2008); *Bryce v. Episcopal Church in Diocese of Colorado*, 289 F.3d 648, 655 (10th Cir. 2002) ("The church autonomy doctrine prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity."); *Redwing v. Catholic Bishop for Memphis*, 363 S.W.3d 436, 443 & n.3 (Tenn. 2012)

(noting both names and suggesting the origin of the phrase "church autonomy doctrine").

The doctrine traces back to *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871), and received an outline of its modern shape in *Kedroff*, 344 U.S. at 113-16 (quoting and paraphrasing *Watson* at length). Nearly 100 years ago, the Kansas Supreme Court, in a brief opinion, cited *Watson* to bow out of an intrachurch dispute over who should lead the congregation and who should be eligible to participate in selecting those leaders because the relevant "matters are ecclesiastical in character and are to be determined by the authorities of the church according to its laws and usages." *King v. Smith*, 106 Kan. 624, 627, 189 P. 147 (1920). We have no need here to elaborate on that history. The contours of the modern constitutional protection for religious beliefs and church governance have been substantially defined since *Kedroff*; that authority guides the resolution of the issue presented here.[3]

[3]Both *Watson* and *King* predate the recognized incorporation of the religion clauses of the First Amendment through the Fourteenth Amendment, so those decisions did not, strictly speaking, rely on constitutionally grounded rights. They reflected jurisprudential principles found in the common law. Neither case directly discussed or explicitly cited the First Amendment. But *Watson* described the political philosophy of the nation as recognizing a clear divide between institutions of government, particularly the courts, and institutions of religion and then invoked that philosophy, with citations to supporting caselaw, to declare disputes based on religious beliefs or "theological controversy" to be outside any appropriately exercised judicial authority. In turn, that declaration informed *King* and, more broadly, the postincorporation scope of the religion clauses.

This court recently restated the barrier in the religion clauses as insulating from government interference " ' "quintessentially religious controversies" ' " addressing theological and doctrinal views. *Church of God in Christ*, 47 Kan. App. 2d at 683 (quoting *Hosanna-Tabor*, 132 S. Ct. at 705, quoting *Milivojevich*, 426 U.S. at 720). That statement reflects a common characterization: The religion clauses keep civil courts from resolving church disputes entailing "consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Jones v. Wolf*, 443 U.S. 595, 602, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979); see *Petruska v. Gannon University*, 462 F.3d 294, 306-07 (3d Cir. 2006); *Bryce*,

289 F.3d at 655 ("[The] church autonomy doctrine prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity.").

The sphere, then, affords religious groups breathing space for their theological views. *Bryce*, 289 F.3d at 655. As a result, those institutions enjoy greater freedom from governmental regulation and intrusion than do many secular organizations in at least some respects. *Hosanna-Taylor*, 132 S. Ct. at 705-06 (holding religion clauses include a "ministerial exception" allowing religious organizations and individual congregations to choose their own spiritual leaders and exempting those groups from federal antidiscrimination statutes in hiring and retaining those leaders); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 504, 99 S. Ct. 1313, 59 L. Ed. 2d 533 (1979); *Schleicher v. Salvation Army*, 518 F.3d 472, 474-75 (7th Cir. 2008).

Courts have recognized an allied concept of undue entanglement to limit government intrusion, through judicial proceedings and otherwise, into the internal affairs of religious organizations. *Colorado Christian University v. Weaver*, 534 F.3d 1245, 1261 (10th Cir. 2008) ("[T]he doctrine protects religious institutions from governmental monitoring or second-guessing of their religious beliefs and practices[.]"); *Rweyemamu*, 520 F.3d at 208 ("[S]ome claims may inexorably entangle [the courts] in doctrinal disputes."). The anti-entanglement principle arises from the Establishment Clause, limiting government action that fosters or inhibits religious beliefs or entities. *Weaver*, 534 F.3d at 1261; *Klagsbrun v. Va'ad Harabonim of Greater Monsey*, 53 F. Supp. 2d 732, 737 (D. N.J. 1999) (The Establishment Clause precludes "excessive entanglement with religion" and, thus, "prohibits courts from determining underlying questions of religious doctrine and practice."). In *Catholic Bishop*, 440 U.S. at 501-02, the United States Supreme Court held that the National Labor Relations Board could not exercise authority over a union of lay teachers in a religious school because inquiry into and resolution of various labor-management issues almost certainly would intrude upon church doctrine affecting policies and practices of the school. The Court noted, for example, if the clergy administering the school suggested

their decisions challenged as potential unfair labor practices were "mandated by their . . . creed," the Board would become impermissibly entangled in evaluating religious tenets. 440 U.S. at 502; see *Weaver*, 534 F.3d at 1261 (citing *Catholic Bishop* as illustrative of the undue entanglement doctrine).

There may be some differences in scope and application between the church autonomy doctrine and the undue entanglement doctrine. But whatever those variations, they do not appear to affect the result in this case. The Archdiocese doesn't suggest a disposition dependent upon one doctrine over the other. The Archdiocese contends those general principles of church autonomy and undue entanglement warrant dismissal of Purdum's libel action against Harcsar.

b. *Treatment of neutral laws of general applicability*

As I indicated earlier, the United States Supreme Court's decision in *Smith*, 494 U.S. at 878-79, bears heavily on this case. The Court held that a neutral law of general applicability could be enforced against a person engaging in the prohibited conduct as part of a religious ritual or practice. 494 U.S. at 879. In that case, two individuals were denied unemployment benefits after they were fired for using peyote during a bona fide religious ceremony. Peyote was (and is) a controlled substance, and its possession violated generally applicable criminal statutes. The individuals were terminated for engaging in unlawful conduct and, therefore, became ineligible for unemployment benefits. They challenged the determination and claimed constitutional protection under the Free Exercise Clause because they used the peyote for religious purposes. The Court rejected that argument, drawing a distinction between religious beliefs and dogma, on the one hand, and religious practices contravening general laws, on the other. 494 U.S. at 878-79 ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct the State is free to regulate."). That remains the proper interpretation of the Free Exercise Clause. *Hosanna-Tabor*, 132 S. Ct. at 706 (citing *Smith*, 494 U.S. at 879).[4]

[4]Congress has legislatively sought to limit *Smith* through the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.* (2006), and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.* (2006). Neither applies here. The United States Supreme Court has held that RFRA does not apply to the states. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 n.1, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006). And RLUIPA, by its terms, affects "land-use regulation . . . and restrictions on the religious exercise of institutionalized persons." *Sossamon v. Texas*, 563 U.S. 277, 281, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011).

The Archdiocese mentions *Smith* only in passing and then simply to suggest its holding does not negate the church autonomy doctrine. Although that proposition is undeniably true, it glosses over the more basic question of *Smith*'s relevance to the issue here in preference to the church autonomy doctrine. The law of defamation is neutral as to religious belief or doctrine and is generally applicable. The law neither makes the publication of certain beliefs actionable nor imposes different standards for statements rooted in religious doctrine. To that extent, *Smith* governs in the sense defamation actions cannot be categorically dismissed as contrary to the church autonomy doctrine simply because publication of the offending statement occurs in some religious context or proceeding. By the same token, however, a defamation claim, depending on the circumstances and the statement alleged to be actionable, would not automatically be impervious to the church autonomy doctrine. See *Klagsbrun*, 53 F. Supp. 2d at 739; *Farley v. Wisconsin Evangelical Lutheran Synod*, 821 F. Supp. 1286, 1289-90 & n.4 (D. Minn. 1993). As with much else, the facts of a given case direct how general legal principles, such as the law of defamation or the church autonomy doctrine, should be applied and reconciled.

c. *Archdiocese's authority discussed*

The Archdiocese's argument on appeal is replete with cases recognizing church autonomy and undue entanglement principles. A number of them apply those principles to dismiss defamation claims. But those cases do not replicate or even approximate the factual circumstances of this one. Based on that authority, I have been left with the clear impression that a ruling for Harcsar and

the Archdiocese upholding the dismissal of Purdum's suit would mark a substantial expansion of the religious clauses sphere.

I do not here engage a case-by-case review of that voluminous authority, for the exegesis would needlessly extend this opinion. I have, however, looked at all of those cases, and I note several as illustrative of the inapplicability of the precedent the Archdiocese has relied upon.

In a number of the cases, a cleric dismissed from a position with a church sued the organization or the individual decision-makers for defamation or wrongful termination. The courts dismissed those actions based on church autonomy because the decisions were dependent on the constitutionally protected selection of religious leaders—the minister exception—and often involved internal divisions over the proper interpretation of ecclesiastical tenets. See, e.g., *Milivojevich*, 426 U.S. at 717-18; *Knuth v. Lutheran Church Missouri Synod*, 643 F. Supp. 444, 448-49 (D. Kan. 1986); *Hiles v. Episcopal Diocese of Massachusetts*, 437 Mass. 505, 510-11, 773 N.E.2d 929 (2002). In other cases, congregants sued over what they considered unfair or improper treatment by their religious leaders or organizations. Again, the courts dismissed the suits because the claims required examination of religious doctrine upon which the challenged treatment rested. See, e.g., *Klagsbrun v. Va'ad Harabonim of Greater Monsey*, 53 F. Supp. 2d 732 (D. N.J. 1999); *O'Connor v. Diocese of Honolulu*, 77 Hawaii 383, 393, 885 P.2d 361 (1994) (The court relies on the church autonomy doctrine to dismiss a parishioner's suit challenging his excommunication over statements he made as the publisher of a newspaper because the claims "can be adjudged only in accordance with standards of church doctrine, church law, or church governance," so they "cannot be adjudicated by a civil court without abridging the free exercise clauses of the state and federal constitutions."); *Hadnot v. Shaw*, 826 P.2d 978, 987-88 (Okla. 1992). Those cases legally and factually stand apart from Purdum's claim here. Harcsar's alleged defamation does not depend upon religious doctrine or practice for its injurious character.

In *Klagsbrun*, a federal district court dismissed the plaintiff's defamation action against the Va'ad, a group of Orthodox rabbis

establishing common practices for a number of synagogues, because the claim would unduly entangle religious doctrine with judicial process. Klagsbrun disobeyed a rabbinical order to grant his wife a religious divorce and claimed, apparently without proof, the couple had already been divorced in conformity with Orthodox Jewish tenets. Klagsbrun had remarried. The Va'ad circulated a notice to the synagogues within its jurisdiction, including the one Klagsbrun attended, outlining the dispute and declaring Klagsbrun was "not entitled to any honors or participation in synagogue services and that all possible social sanctions should be place[d] against him." *Klagsbrun*, 53 F. Supp. 2d at 736. The court concluded that it would be pulled into a constitutionally impermissible assessment of religious tenet and practice to judge whether the members of the Va'ad had defamed Klagsbrun. 53 F. Supp. 2d at 739.

In *Hadnot*, the court affirmed the dismissal of a congregant's claims against her church alleging both the reason for her excommunication and a letter sent to her stating the reason to be defamatory and otherwise tortious. The court found that "the First Amendment will protect and shield the religious body from liability for the activities carried on pursuant to the exercise of church discipline." 826 P.2d at 987. But the court also indicated that the constitutional protection would not extend to communication outside the church or communication after "implementation" of the severance of the church-congregant relationship. 826 P.2d at 985-86 (court reviews alleged publication of the reason outside the church under traditional tort principles and finds plaintiff failed to establish a material factual dispute to preclude summary judgment); 826 P.2d at 988-89 (defamation law governs publication made after excommunication or voluntary withdrawal from church community has been effected).

Here, Purdum was not a member of the Catholic Church. The annulment did not affect his standing within the Catholic Church. In his suit, he does not seek to change in any way his relationship with the Catholic Church. Nor does he contend the Archdiocese or any of its officials libeled or otherwise caused him any legal injury.

In a pair of cases, the courts refused to allow clerics investigated for violating church rules to bring defamation actions against those who accused them in the internal disciplinary process. *Stepek*, 392 Ill. App. 3d at 752; *Hiles*, 437 Mass. at 506-07. In *Hiles*, an Episcopal priest brought an array of claims against the diocese, the congregant initiating intrachurch charges against him for carrying on an adulterous relationship with her, and the church leaders who then pursued those charges. The Massachusetts Supreme Court upheld dismissal of the claims against the diocese and the church leadership on the grounds that internal discipline of clergy entailed quintessentially protected activity under the religion clauses. 437 Mass. at 510-11. The court affirmed the dismissal of the defamation claim against the priest's accuser because the charge was disclosed only to a church official, thereby triggering the organization's internal disciplinary process. The publication of the complaint, therefore, was an integral part of that process and shared the constitutional protection of that process. 437 Mass. at 512-13. As the court recognized: "Hiles' defamation claim against [congregant] Hastie touches the core of the church-minister relationship." 437 Mass. at 513. And the church "has a singular interest in protecting its faithful from clergy who will take advantage of them." 437 Mass. at 513. The court also found that under those circumstances, a civil court should refrain from judging the credibility of the accusation—a necessary component of a defamation claim—in deference to the church's investigation and conclusions as part of its disciplinary process. 437 Mass. at 513 ("The First Amendment's protection of internal religious disciplinary proceedings would be meaningless if a parishioner's accusation that was used to initiate those proceedings could be tested in a civil court."). The court suggested that the constitutional protection belonged, at least in part, to the individual initiating the internal accusation as an exercise of religious belief. 437 Mass. at 513. But the court also recognized that absolute protection under the religion clauses would not necessarily extend to defamation actions unconnected to the church-minister relationship. 437 Mass. at 514.

Relying heavily on *Hiles*, the Illinois Court of Appeals took essentially the same position in *Stepek*, 392 Ill. App. 3d at 752-53. In

*Stepek*, as I have explained, a Catholic priest sued two brothers for defamation and intentional infliction of emotional distress because they had lodged charges with the Archdiocese of Chicago that he had sexually abused them years earlier and because the Archdiocese then removed him from all ministry duties after investigating the charges. The brothers joined the Catholic Bishop as a third-party defendant. The brothers and the Catholic Bishop moved to dismiss the action asserting the constitutional protection of church autonomy under the religion clauses. Adopting the rationale of *Hiles*, the court found the church process for clergy discipline to be constitutionally off limits in civil suits and an accused in such a proceeding could not maintain a suit that would "interfere[e] with the Church's ability to consider the veracity of the . . . defendants' charges through that process." 392 Ill. App. 3d at 752-53.

The rulings in *Hiles* and *Stepek* ultimately rest on the well-recognized autonomy religious organizations enjoy in selecting and regulating their spiritual leaders. The courts have recognized an especially robust protection from judicial intrusion for those decisions and the processes used in making those decisions. Purdum's suit has nothing to do with those issues. And those cases fail as precedent supporting church autonomy here. As I have discussed, the *Stepek* court also cited *Cimijotti*'s unique recognition of absolute privilege for statements a congregant makes in any church proceeding as supporting dismissal. But *Cimijotti* had nothing to do with clergy discipline—the plain basis for the rule laid down in *Hiles* and adopted in *Stepek*.

Nor does *Cimijotti* really square up with the secondary rationale advanced in both cases that a cleric accused of religious misconduct ought not use a civil suit to collaterally undermine factual determinations of the church's investigatory body. *Stepek*, 392 Ill. App. 3d at 752; *Hiles*, 437 Mass. at 513. That rationale does not rest on some privilege or immunity from suit extended to the statements or accusations themselves. Rather, it reflects a form of judicial abstention under which one tribunal should not interfere with another tribunal having a superior claim to jurisdiction over a dispute. See *Lance v. Dennis*, 546 U.S. 459, 460, 126 S. Ct. 1198, 163 L. Ed. 2d 1059 (2006) (*Rooker-Feldman* doctrine precludes lower

federal courts from exercising jurisdiction over suits effectively challenging existing state court judgments); *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 15-16 & n.8, 107 S. Ct. 971, 94 L. Ed. 2d 10 (1987) (Analogizing to abstention, the Court holds that as a matter of comity a civil action should be dismissed or stayed until a tribal court determines its jurisdiction to hear the dispute because, in part, doing otherwise would "impair [the tribe court's] authority over reservation affairs."); *Younger v. Harris*, 401 U.S. 37, 43-45, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971) (federal courts refrain from interfering with criminal prosecutions in state courts); *AEP Energy Services Gas Holding v. Bank of America, N.A.*, 626 F.3d 699 (2d Cir. 2010) (first court to obtain jurisdiction over the parties and the disputed issues takes priority over different court later acquiring jurisdiction for the same parties and issues); *In re AutoNation, Inc.*, 228 S.W.3d 663, 670 (Tex. 2007) (recognizing and applying first-to-obtain-jurisdiction rule); see also *KPMG LLP v. Cocchi*, 565 U.S. ___, 132 S. Ct. 23, 25-26, 181 L. Ed. 2d 323 (2011) (State and federal courts are required to honor valid agreements to decide disputes in arbitral forums, thus favoring an extrajudicial mechanism, although the stated basis for doing so typically lies in enforcing the parties' contracts rather than in exercising jurisprudential abstention). The abstention outlined in *Hiles* and *Stepek* originates in the religion clauses and, if accepted, would command enforcement as a matter of constitutional law, whereas courts commonly weigh abstention as a preferred, though flexible, jurisprudential rule. Both the *Hiles* and *Stepek* courts buttressed their decisions with a contractual or consensual theory, finding the priests effectively agreed to participate in and abide by the intrachurch disciplinary processes in conjunction with performing their ministerial duties. *Stepek*, 392 Ill. App. 3d at 752; *Hiles*, 437 Mass. at 513. The courts viewed the priests' actions in filing suits effectively challenging the veracity of accusations as inimical to those agreements. In this case, the parties have not argued consent or abstention as considerations supporting dismissal. The Archdiocese has not suggested Harcsar's annulment would be denied or revoked if the statements made in her petition to the Catholic Church were adjudged false in Purdum's civil suit—a position

that conceivably might support church autonomy on abstention grounds.

The Archdiocese relies heavily on *Bryce*, 289 F.3d at 651, in which the Tenth Circuit applied the church autonomy doctrine to affirm the dismissal of a sexual harassment suit Bryce brought against the Episcopal Church employing her as a youth minister and against various leaders and members of the congregation. Bryce, a lesbian, participated in a civil commitment ceremony with her partner, an ordained minister in another denomination. Bryce's partner also was a named plaintiff in the suit. After the commitment ceremony, several church leaders met with Bryce to inform her that her employment would be terminated because her familial relationship conflicted with Episcopal doctrine recognizing marriage as a union between a man and a woman. They also suggested homosexuality generally was a divisive religious issue within the Episcopal faith. One of the church's ministers circulated a letter to the leadership explaining what he perceived to be the rift between Bryce's personal life and the denomination's religious teachings. The letter also included what many people today would characterize as false stereotypes about gays and lesbians, particularly with respect to their interactions with children. The church, with Bryce's consent, scheduled four meetings that members of the congregation could attend to discuss Bryce's employment, Episcopal doctrine about marriage and homosexuality, and related matters. At the start of each meeting, Bryce and church leaders explained their respective positions, and a trained facilitator moderated the discussions. The court opinion characterized the meetings as both generally supportive of Bryce and focused on issues of church doctrine. But the minister who authored the letter repeated much of what he wrote, and some members of the congregation voiced comments the court suggested could be viewed as offensive and, in some instances, demonstrably incorrect. 289 F.3d at 653, 657-58.

In affirming the dismissal of Bryce's suit, the Tenth Circuit relied exclusively on the church autonomy doctrine and never addressed the merits of the sexual harassment claim. 289 F.3d at 658-59. In reaching that conclusion, the court also traced the history of the

doctrine, a discussion we have cited. 289 F.3d at 655-57. Given Episcopal doctrine on homosexuality and marriage, the court found the matter of Bryce's employment to be inseparable from "ecclesiastical" considerations of faith, church organization, and religious "rule, custom, [and] law." 289 F.3d at 658. As such, the constitutional protections reflected in the church autonomy doctrine precluded Bryce's claim. The court found her partner's claim for sexual harassment similarly barred because it entailed the same religious issues and would necessarily contravene church autonomy by inhibiting "the right of the church to engage freely in ecclesiastical discussions with members and non-members." 289 F.3d at 658. Even though Bryce's partner was neither a member nor an employee of the church, the effect of the suit was the same. In addition, the court noted that she participated with Bryce in the congregant meetings, thereby placing herself within the church dispute. 289 F.3d at 658.[5]

[5]The court expressly declined to rely on the minister exception affording constitutional protection to church decisions regarding hiring, discipline, and termination of religious or spiritual leaders. The panel found the inquiry unnecessary and declined to conclude Bryce functioned as a minister, notwithstanding her job title. 289 F.3d at 658 n.2. Based on the job description offered in the decision, 289 F.3d at 651, the issue was hardly clear cut. See *Hosanna-Tabor*, 132 S. Ct. at 699-700 (training and duties of "called" teacher show her to be a minister for purposes of the exception); 132 S. Ct. 707-08 (same); 132 S. Ct. at 708 (use of the title "minister" does not necessarily establish the exception applies).

As the Tenth Circuit framed the facts and issues in *Bryce*, the church controversy and the resulting litigation necessarily hinged on religious doctrine. Bryce's termination and the expressions she and her partner found harassing largely derived from how congregants and leaders of the particular church chose to interpret and apply denominational pronouncements about marriage as a Christian covenant. That civil suit inevitably would implicate the "correctness" of those distinctly religious beliefs. As I discuss in the next section, Purdum's defamation action depends upon no comparable melding of Catholic Church teachings and the factual elements of his claim.

*d. Purdum's suit is not barred by church autonomy or undue entanglement*

Having surveyed church autonomy principles, including the minister exception and the related undue entanglement doctrine, and having reviewed the legal authority and argument the Archdiocese has presented on appeal, I fail to see an articulated basis in those constitutional protections requiring dismissal of Purdum's defamation action against Harcsar. The Free Exercise Clause extends particularly robust protection to church decisions regarding the selection and intradenominational regulation of religious leaders. The minister exception does not apply here. And the Archdiocese makes no overt argument that it does. But much of the authority on which the Archdiocese relies entails decision-making regarding retention or discipline of clergy. The especially deferential treatment afforded religious organizations in that sphere doesn't translate to the circumstances of this case either logically or legally. Nothing about this suit challenges or implicates the leadership of the Archdiocese or the Catholic Church. Purdum has not sued the Catholic Church, its subsidiary organizational entities, or any of its clergy—the only defendant is Harcsar. Nor does the suit amount to a collateral attack on a church decision to punish or dismiss a cleric.

Even under the broader application of church autonomy to bar suits caught up in religious doctrine or ecclesiastical issues, I fail to see a basis for dismissal. Purdum's action neither challenges the authority of the Archdiocese to grant Harcsar an annulment nor otherwise seeks to inhibit or prevent that process from going forward. The suit requests no equitable relief that would block an annulment of Purdum's marriage to Harcsar. The Archdiocese does not argue that the filing of the suit or a judgment in Purdum's favor would in any way diminish Harcsar's ability to secure or retain an annulment. To the contrary, in outlining reasons for intervention, the Archdiocese submitted its legal interests deviate from Harcsar's because it "is less interested in the truth or publication of [her] statements."

Purdum alleges that the petition for annulment contains a factual representation about him that is false and defamatory. The rep-

resentation has nothing to do with his religious beliefs or the Catholic Church's ecclesiastical doctrine or views. He does not challenge or impugn teachings of the Catholic Church. Whether the statement is true or false does not depend upon church canon or dogma. Its purportedly defamatory character is similarly distinct from any set of religious values. A court or a jury would not be drawn into a theological debate or an evaluation of annulments or other Catholic ritual in assessing the statement's falsity or its defamatory nature. In other words, the forum of publication—as part of a request to the Archdiocese for an annulment—is immaterial to the content of the statement that Purdum says makes it libelous. The statement would have been no more or less false and defamatory if Harcsar never sought an annulment and, instead, had disseminated it to Purdum's work supervisor. In his suit, Purdum requests monetary damages against Harcsar as his only relief. The Catholic Church faces no legal liability.

So the church autonomy doctrine simply does not come into play as Purdum has cast his legal action and as the Archdiocese has opposed it to this point. Rather, as I have suggested, *Smith*, 494 U.S. 872, provides the governing constitutional authority in that Harcsar may have made the contested statement as part of a religious rite or ritual, just as Smith used peyote, but the laws making their respective behaviors actionable are of general application and theologically neutral. Just as Smith did not get a religion-clauses free pass because his otherwise allegedly unlawful activity was undertaken with a religious purpose, Harcsar cannot avoid answering Purdum's action.

The undue entanglement doctrine fails as a defense for much the same reason church autonomy doesn't require dismissal on this limited record. The protections against entanglement serve fundamentally the same purpose by preventing excessive government intrusion into religious belief and practice. Given the contours of Purdum's suit, the defamation claim does not intrude into, challenge, or require an assessment of Catholic tenets generally or annulments specifically.

The Archdiocese also suggests an undue entanglement may arise from discovery, apart from any substantive review of Catholic doc-

trine. Judge Green also alludes to discovery as entangling. The Archdiocese anticipated it would be asked to provide documents—either through a request for production if it were a party or a subpoena if it were not—and church officials involved in the annulment process would be deposed. That certainly seems to be a reasonable expectation. The Archdiocese argues discovery would impermissibly intrude on Catholic Church practices and confidential information. Those fears, however, look to be unwarranted and so would not justify dismissing Purdum's suit.

Civil discovery frequently requires disclosure of confidential or otherwise sensitive material, such as medical records, tax and financial information, or proprietary trade or research data. The Kansas Code of Civil Procedure recognizes multiple ways of protecting that sort of documentary evidence through protective orders or other judicial control. See K.S.A. 2012 Supp. 60-226(c). A court may prohibit excessively intrusive discovery that lacks some demonstrable purpose. It may allow production of redacted documents or require that materials produced be maintained and used in a strictly regulated manner to preserve their confidentiality. With respect to depositions, a court may similarly limit the scope of questioning to discoverable information, and the transcripts may be sealed if the content is especially sensitive. The legal representative of a nonparty deponent may seek an appropriate order of the court before the deposition or during the examination. K.S.A. 2012 Supp. 60-226(c)(3); K.S.A. 2012 Supp. 60-230(d). In atypical cases in which lines between permissible and impermissible examination frequently might be crossed intentionally or inadvertently, a judge or special master may preside over a deposition to assure adherence to discovery limitations. See K.S.A. 2012 Supp. 60-253(c); *Leor Exploration & Production v. Aguiar*, No. 09-60136-CIV, 2009 WL 3097207, at *2 (S.D. Fla. 2009) (unpublished opinion) (Under comparable federal rules, the court appoints a special master to preside over the deposition of a lawyer for the defendant because of privilege and confidentiality issues.).

At oral argument, counsel for Purdum suggested discovery from the Archdiocese would be aimed at substantiating dissemination of Harcsar's statement in the annulment petition. In other words,

Purdum would seek information about who saw or discussed the contents of the annulment petition and specifically the allegedly defamatory statement, presumably along with its impact, if any, on their views of his reputation. See *Byers v. Snyder*, 44 Kan. App. 2d 380, 396, 237 P.3d 1258 (2010) (elements of defamation are: a false and defamatory statement; communication of the statement to third persons, that is, publication; and harm to reputation resulting from the communication); *Droge v. Rempel*, 39 Kan. App. 2d 455, 459, 180 P.3d 1094 (2008) (same). Purdum's counsel disclaimed any need to inquire into the Archdiocese's substantive analysis or deliberation of Harcsar's application for annulment or the canonical basis for any decision to grant or deny it. Again, without prejudging specific discovery issues, that reflects a reasonable dividing line between the discoverable and nondiscoverable. Appropriate discovery related to publication would not intrude upon church doctrine.

The request for production Judge Green cites appears to be overly broad. But propounding too expansive a discovery request cannot justify dismissing a plaintiff's suit or conversely justify entering judgment against a defendant. A district court has the authority to focus discovery, prevent abusive discovery, and to insure confidentiality when necessary. Chronic discovery abuse in a given case would be another matter, potentially calling for harsh sanctions up to and including entry of an adverse judgment. See K.S.A. 2012 Supp. 60-226(f)(3). But that's not the issue here. Appropriately tailored discovery pertaining to Purdum's libel claim would not result in constitutionally impermissible entanglement of the courts in church doctrine or decision-making. The district court presumably would monitor the pretrial proceedings as necessary and enter those orders required to avoid unduly entangling or intrusive inquiry while generally permitting appropriate discovery contemplated in civil suits.

In sum, the Archdiocese has chosen to present its argument as if church autonomy and undue entanglement principles already—plainly and obviously—govern this case. As the Archdiocese has framed the issues based on Purdum's libel claim, its premise looks to be incorrect. And the Archdiocese really has offered no studied

argument for a reasoned expansion of either of those doctrines to reach the libel alleged here. Given the record and the issues presented, the district court correctly rejected church autonomy and undue entanglement as bases to dismiss Purdum's suit at the pleading stage.

Before closing this discussion, I comment on an argument the Archdiocese has offered to bolster its expansive interpretation of the religion clauses without separately identifying that position or citing supporting authority. At several points in its brief, the Archdiocese submits that persons such as Harcsar may be reluctant or flat unwilling to request annulments if they believe they may be sued for what they put in their petitions and that other persons may be deterred from supporting those petitions for the same reason. The Archdiocese says suits for defamation, like Purdum's, must be dismissed under the religion clauses to eliminate that potential burden on a legitimate religious practice. In other words, defamation suits have an impermissible "chilling effect" on persons wishing to obtain annulments.

In making that suggestion, the Archdiocese, without explanation, tries to transplant a recognized, though limited, avenue for challenging direct government action, typically in the form of criminal statutes, impairing or inhibiting constitutionally protected speech. See *Virginia v. Hicks*, 539 U.S. 113, 118-19, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003) (A party may challenge the threatened enforcement of a law as imposing an impermissible "chill [of] constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions."); *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871-72, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997). But the challenged law's impact on protected speech must be " 'substantial' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications" before the courts will step in to limit or preclude its enforcement. *Hicks*, 539 U.S. at 119-20 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S. Ct. 2908, 37 L. Ed. 2d 830 [1973]).

The religion clauses, however, do not appear to support a constitutionally based chilling-effect argument as part of the church autonomy doctrine or otherwise. See *American Family v. City &*

*County of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002) (declining to consider "chilling effect" argument in conjunction with claim against municipality based on Free Exercise Clause); *United States v. Grayson County State Bank*, 656 F.2d 1070 (5th Cir. 1981) (rejecting argument that IRS summons to bank for information related to church's account would have chilling effect under the Free Exercise Clause because the government action "does not restrict the church's freedom to espouse religious doctrine"). Even if the religion clauses did, a private suit or the threat of such a suit inhibiting a religious practice would not trigger protection on that basis, consistent with parallel free speech principles. See *American Family Ass'n*, 277 F.3d at 1124 (court declines to find "chilling effect" protections in Free Exercise Clause given the absence of legislative action affecting religious practice).

Here, Harcsar faced no criminal or other statutory recrimination, and no governmental entity has threatened her or taken action against her. Likewise, no one else seeking an annulment would confront direct government action imposing a penalty or similar legal detriment for doing so. On that basis alone, the Archdiocese's reliance on a constitutionally grounded chilling-effect argument seems to be without legal force.

Even if I were to suppose a private suit asserting a common-law claim amounted to the sort of government action that would permit threshold consideration of a chilling-effect argument—an extravagant supposition—defamation wouldn't otherwise fit. The law of defamation permits private parties a remedy for falsehoods injurious to their reputations. As I pointed out earlier, those claims have long been recognized as serving legitimate personal and societal interests. See *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004) ("law of defamation embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks"); *Kanaga v. Gannett Co., Inc.*, 687 A.2d 173, 181 (Del. 1996) (same). At the same time, however, defamation law has been crafted to prevent burdening communication otherwise protected under the Free Speech Clause. See *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) (public figure must prove defamatory

statement was published with knowledge that it was false or with reckless disregard for its truth or falsity); *Turner v. Halliburton Co.*, 240 Kan. 1, 7-8, 722 P.2d 1106 (1986) (noting various qualified privileges applicable in defamation actions); *Gobin*, 232 Kan. at 5 (Damages for defamation may not be presumed; they must be proved.); *Luttrell v. United Telephone System, Inc.*, 9 Kan. App. 2d 620, 622-23, 683 P.2d 1292 (1984) (qualified privilege for intracorporate publication of alleged defamation).

Many of those safeguards apply equally here. And they afford Harcsar or anyone else seeking an annulment considerable protection for the content of their petitions to the Catholic Church. On balance, the checks built into defamation law sufficiently keep those claims from impermissibly inhibiting or chilling constitutionally protected speech, and I have no reason to conclude those checks would fail to serve a like role as to secular statements made in conjunction with religious practices. Assuming a chilling-effect argument could be raised under the Free Exercise Clause at all, it would not apply here without substantially enlarging how those arguments are now applied in free speech cases. The Archdiocese offers no rationale for that kind of bifurcated approach.

Because Harcsar's challenged statement was entirely secular, although disseminated in a religious ritual, the Archdiocese's position would, in effect, insulate *any* communication made in the course of a religious practice from civil liability for defamation, even though the content might be actionable if published in another forum. As I have pointed out, that position is difficult to reconcile with *Smith*. The argument also would accord especially favored treatment to religious proceedings compared to other means of communication when it comes to defamation law—a position difficult to reconcile with the Establishment Clause's limitation on governmental preference for religious activity. See 6 Rotunda & Nowak, Treatise on Constitutional Law § 21.6(d) (4th ed. 2007) ("An exemption from law of general applicability . . . that only provided an exemption for members of a specific religion, or an exemption only for persons who held religious beliefs, would establish a denominational preference that would violate the establishment clause."). So either chilling-effects arguments have no ba-

sis in the religion clauses, or, at the very least, they ought not be used to defeat defamation actions based on secular statements made in the course of religious ritual or practice.

Moreover, statements of religious belief or doctrine and statements related to the selection or regulation of spiritual leaders would otherwise be protected under the church autonomy doctrine so any chilling-effect protection would be superfluous for them. Many secular statements would be shielded that way. For example, an intrachurch complaint that a cleric had sexually abused a minor is a secular statement, but it would not support a defamation claim based on the minister exception rather than on any chilling-effect theories borrowed from free speech jurisprudence. The Archdiocese again looks to be augmenting accepted religious clause law without a reasoned basis for doing so.

*4. Opinions to affirm incorrectly invoke subject matter jurisdiction and improperly rely on issues the parties have not raised.*

In their separate opinions finding that Purdum's suit should be dismissed on the pleadings, Judge Green and Judge Bruns incorrectly characterize the issues they address as going to the court's subject matter jurisdiction. They really are affirmative defenses that do not cut off the court's jurisdictional authority. The error affects how those issues ought to be treated on a motion to dismiss presented under K.S.A. 2012 Supp. 60-212(b) or for judgment on the pleadings under K.S.A. 2012 Supp. 60-212(c). Even if the issues dealt with subject matter jurisdiction, my colleagues err in taking them up now because the parties have never asserted or briefed them. The factual record is materially incomplete, particularly on consent, and argument from counsel nonexistent. A court ought not dismiss even on jurisdictional grounds without hearing from the parties on the issue.

*a. Subject matter jurisdiction not at issue; defendants raise affirmative defenses*

Subject matter jurisdiction confers authority on a court to hear a particular type of case. *Chelf v. State*, 46 Kan. App. 2d 522, 529, 263 P.3d 852 (2011); *In re Estate of Heiman*, 44 Kan. App. 2d 764,

Syl. ¶ 2, 241 P.3d 161 (2010). A party may raise lack of subject matter jurisdiction in a motion to dismiss under K.S.A. 2012 Supp. 60-212(b)(1). In deciding a 60-212(b)(1) motion, the district court can hear evidence and make credibility findings. See *Odyssey Marine v. Unidentified Shipwrecked Vessel,* 657 F.3d 1159, 1169 (11th Cir. 2011); *Lovely v. United States,* 570 F.3d 778, 781-82 (6th Cir. 2009); *Radil v. Sanborn Western Camps, Inc.,* 384 F.3d 1220, 1224 (10th Cir. 2004). A court, therefore, is not limited to the factual allegations in the pleadings. *Odyssey Marine,* 657 F.3d at 1169. Typically, the party asserting subject matter jurisdiction bears the burden of proof. *Garanti Finansal Kiralama v. Aqua Marine & Trading,* 697 F.3d 59, 65 (2d Cir. 2012); *United States v. Ceballos-Martinez,* 387 F.3d 1140, 1143 (10th Cir. 2004).

But absolute privilege, church autonomy, and consent do not deprive a court of subject matter jurisdiction. They are, rather, affirmative defenses that if proven defeat a plaintiff's substantive claim. And that limits how they may be treated under K.S.A. 2012 Supp. 60-212. If a court were to properly consider those defenses at this stage in the case, it would be on a motion to dismiss for failure to state a claim under K.S.A. 2012 Supp. 60-212(b)(6) or for judgment on the pleadings under K.S.A. 2012 Supp. 60-212(c). The same standard governs both and permits dismissal only if the facts alleged or admitted in the pleadings demonstrate no theory of relief for the plaintiff or an insuperable legal bar to relief. *Rector v. Tatham,* 287 Kan. 230, Syl. ¶ 1, 196 P.3d 364 (2008) (dismissal proper only if factual allegations fail to establish any theory of recovery); *Nelson Energy Programs v. Oil & Gas Technology Fund,* 36 Kan. App. 2d 462, 472, 143 P.3d 50 (2006) (noting the same standard should be applied under both K.S.A. 60-212(b)(6) for failure of petition to state a claim and K.S.A. 60-212(c) for judgment on the pleadings); *Koss Construction v. Caterpillar, Inc.,* 25 Kan. App. 2d 200, 200-01, 960 P.2d 255 (1998) (court to rely on the pleadings only); *Ray v. Kertes,* 285 F.3d 287, 295 n.8 (3d Cir. 2002) (If an affirmative defense " 'would present an insuperable barrier to recovery by the plaintiff,' " it may be considered on a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6) [quoting *Flight Systems, Inc. v. Electronic Data Systems,* 112 F.3d 124, 127 (3d Cir. 1997)]).

The factual allegations and any reasonable inferences drawn from them must be taken as true. *Rector v. Tatham*, 287 Kan. 230, Syl. ¶ 1. A motion for judgment on the pleadings or a motion to dismiss for failure to state a claim, then, requires the district court to liberally construe the allegations in favor of plaintiff and precludes review of any external evidentiary sources. The basis on which a court may grant the motion is far narrower than on a challenge to subject matter jurisdiction. See *Williamson v. Tucker*, 645 F.2d 404, 412-13 (5th Cir. 1981) (comparing the court's limited review in dismissing for failure to state a claim under Fed. R. Civ. Proc. 12(b)(6) with its more expansive review in dismissing for lack of subject matter jurisdiction under Fed. R. Civ. Proc. 12(b)(1)).

Courts have regularly recognized privilege to be an affirmative defense to a claim and not something that negates subject matter jurisdiction. *General Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990) ("invocation of the absolute privilege is an affirmative defense"); *Riley v. Riley*. 340 S.W.3d 334, 339 (Mo. App. 2011); *Isle of Wight County v. Nogiec*, 281 Va. 140, 155, 704 S.E.2d 83 (2011); see *Rehberg v. Paulk*, 566 U.S. ___, 132 S. Ct. 1497, 1505, 182 L. Ed. 2d 593 (2012) (Witnesses appearing before grand juries enjoy absolute immunity or privilege in federal civil rights actions brought against them for their testimony, but the Court does not frame the defense as one based on or defeating subject matter jurisdiction.). The Kansas Supreme Court has taken that view. *Turner v. Halliburton, Co.*, 240 Kan. 1, 7, 722 P.2d 1106 (1986). The district court, therefore, erred by treating the *Cimijotti* privilege as negating subject matter jurisdiction and by applying the relaxed review permitted under in K.S.A. 60-212(b)(1). Judge Bruns repeats that error. Qualified privilege, as a partial defense in defamation law, has nothing to do with subject matter jurisdiction. *Turner*, 240 Kan. at 7-8); *McIntosh v. Partridge*, 540 F.3d 315, 326 (5th Cir. 2008) (qualified privilege is affirmative defense to defamation under Texas law requiring proof of malice); *Smith v. Des Moines Public Schools*, 259 F.3d 942, 948 (8th Cir. 2001) (under Iowa law, qualified privilege is affirmative defense requiring plaintiff to prove actual malice). The issue of privilege should be

governed by the demanding standards for dismissal on the pleadings.

Similarly, church autonomy and the correlative minister exception and undue entanglement are affirmative defenses and not doctrines depriving courts of subject matter jurisdiction. *Hosanna-Tabor*, 132 S. Ct. at 709 n.4. In *Hosanna-Tabor*, the United States Supreme Court specifically concluded the minister exception to be "an affirmative defense to an otherwise cognizable claim" that did not deprive a court of the authority to hear a case. 132 S. Ct. at 709 n.4. The minister exception has been crafted to "prohibit government involvement in such ecclesiastical decisions" bound up in "church control over those who will personify its beliefs." 132 S. Ct. at 705-06. It is, therefore, a particularized application of the constitutional prohibition on undue entanglement of governments in church affairs and the church autonomy doctrine. *Alcazar v. Corp. of the Catholic Archbishop*, 627 F.3d 1288, 1291 (9th Cir. 2010); *Schleicher v. Salvation Army*, 518 F.3d 472, 474 (7th Cir. 2008) ("[b]locking . . . entanglements of the secular courts in religious affairs is one of the grounds on which the ministers exception was devised"). To the extent Purdum consented to the Catholic Church's oversight of his sacramental marriage and its annulment, that consent amounts to an affirmative defense to his suit based on excessive entanglement. But consent would not deprive the courts of subject matter jurisdiction to hear Purdum's suit, and the issue should not be determined under the standards of K.S.A. 2012 Supp. 60-212(b)(1). The authority Judge Bruns cites suggesting the church autonomy doctrine extinguishes subject matter jurisdiction predates *Hosanna-Tabor* and does not survive the Court's rejection of that position in resolving a conflict in the caselaw on the point. See *Hosanna-Tabor*, 132 S. Ct. at 709 n.4; *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1241-42 & n.4 (10th Cir. 2010) (noting minister exception reflects narrow application of broad church autonomy doctrine; both properly treated as defenses to claims and rather than as attacks on court's subject matter jurisdiction); *Petruska v. Gannon University*, 462 F.3d 294, 302-03 (3d Cir. 2006) (minister exception and church autonomy doctrine entail defenses to claims but do "not affect the

court's authority to consider them," citing *Bryce*, 289 F.2d at 654); *Bryce*, 289 F.3d at 654 (church autonomy doctrine properly treated as defense to plaintiffs' claims and not as divesting court of subject matter jurisdiction).

In the context of a libel or defamation action, consent of the injured party is also an affirmative defense to the claim—not a prohibition of the court's authority to hear the suit. *Bogie v. Rosenberg*, 705 F.3d 603, 612 (7th Cir. 2013) (consent is in the nature of an affirmative defense to an action for invasion of privacy); Restatement (Second) of Torts § 583 (1976) (consent to publication of defamatory matter is a complete defense); 53 C.J.S., Libel § 220 (consent recognized as affirmative defense).

Because privilege and consent—in whatever form they might be considered—are defenses to Purdum's cause of action for libel and would not—even if proven—deprive the courts of subject matter jurisdiction, they must be considered under the demanding standards for motions to dismiss under K.S.A. 2012 Supp. 60-212(b)(6) or judgments on the pleadings under K.S.A. 2012 Supp. 60-212(c). Measured that way, there are no factual averments in the pleadings establishing the nature and extent of Purdum's consent either to allowing the Catholic Church to annul his marriage to Harcsar or to being defamed in that process.

Neither this court nor the district court could have entered judgment against Purdum based on the factual averments in the amended petition, the answer, or the two pleadings taken together. The only mention of consent turns up in a single paragraph of Harcsar's answer asserting Purdum "consented to Defendant's alleged defamatory statements by being married in the Catholic Church and signing a confidentiality agreement with the Church" and characterizing that assertion as an affirmative defense. While that assertion preserves the issue, see K.S.A. 2012 Supp. 60-208(c) (affirmative defenses shall be stated in a responsive pleading), it fails to set forth facts that could be considered to dismiss on the pleadings. Neither the terms nor the circumstances of Purdum's purported consent were set out. Nor was the confidentiality agreement described or incorporated into the answer. A "confidentiality agreement" would not obviously be the legal equivalent to consent.

The undeveloped averment of consent fails to support dismissal at the pleading stage. The factual particulars of the consent would have to be established in discovery and its legal efficacy addressed in a motion based on that record.

Judge Green and Judge Bruns incorrectly treat those issues as challenges to subject matter jurisdiction and, therefore, err in considering evidentiary materials outside the pleadings, particularly the affidavits attached to the Archdiocese's motion to dismiss. Their review properly should be confined to the pleadings alone.

If a court considers materials outside the petition or pleadings in weighing dismissal under K.S.A. 2012 Supp. 60-212(b)(6) or K.S.A. 2012 Supp. 60-212(c), the motion must then be treated as one for summary judgment. K.S.A. 2012 Supp. 60-212(d); *State ex rel. Slusher v. City of Leavenworth*, 279 Kan. 789, 797, 112 P.3d 131 (2005) (court's use of materials outside the petition converts a motion to dismiss to one for summary judgment). In that instance, "[a]ll the parties must be given a reasonable opportunity to present all the material pertinent to the motion." K.S.A. 2012 Supp. 60-212(d). That hasn't happened here. So this court should not rely on evidentiary materials from the Archdiocese in evaluating the sufficiency of the affirmative defenses. To the extent Purdum consented to the district court's consideration of those materials, it was solely to resolve challenges to subject matter jurisdiction. The Archdiocese's motion to dismiss was directed only to lack of subject matter jurisdiction. Purdum neither agreed to convert the motion to dismiss to one for summary judgment on affirmative defenses nor waived the opportunity to conduct discovery to respond to a summary judgment motion.

Purdum's amended petition arguably does contain sufficient factual averments to consider an affirmative defense of absolute privilege based on Harcsar's making the defamatory statement to the Archdiocese in support of her request for an annulment and publication being confined to review in that process. But the district court erred as a matter of law in recognizing an absolute privilege deriving from the religion clauses, as Judge Green and I agree. Judge Bruns, therefore, mistakenly relies on the phantom *Cimijotti* privilege in opting to uphold the dismissal, and that is true whether

the privilege, if it actually existed, ought to be treated as an affirmative defense or a bar to subject matter jurisdiction.

The same cannot be said of consent. The amended petition and the answer simply contain no factual averments sufficient to determine the nature and scope of Purdum's consent and, in turn, to assess its legal implications. On the record before us, a motion to dismiss or for judgment on the pleadings based on consent must fail. For that reason alone, consent cannot provide an alternative basis to uphold the judgment against Purdum.

b. *Purdum has not been given an opportunity to address consent*

Even if I am wrong in characterizing consent—the cornerstone of Judge Green's decision to affirm and a substantial weight-bearing beam in Judge Bruns' opinion—as an affirmative defense, there is a more fundamental flaw in affirming on that ground. The issue of consent was never briefed or argued to the district court as a basis for dismissal, and it has not been briefed or argued here. Accordingly, the parties have not had an opportunity to address the issue. And, more specifically, Purdum hasn't been given a chance to argue his case against dismissal based on consent.

Assuming consent actually goes to subject matter jurisdiction, the court has an obligation to acknowledge the issue although the parties have not. *Ryser v. State*, 295 Kan. 452, 456, 284 P.3d 337 (2012). But that does give the court license to decide the issue without input from the parties. To the contrary, a court should afford the parties—particularly the one about to be deprived of a judicial forum for relief—the opportunity to present legal authority and, if necessary, evidence on the issue. *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 290 (3d Cir. 2006) ("A court can evaluate its jurisdiction without an evidentiary hearing 'so long as the court has afforded [the parties] notice and a fair opportunity to be heard.'" [quoting *Tanzymore v. Bethlehem Steel Corporation*, 457 F.2d 1320, 1323-24 (3d Cir. 1972)]); *Nicodemus v. Union Pacific Corp.*, 318 F.3d 1231, 1235 (10th Cir. 2003) (appellate court holds district judge erred in dismissing action because it "did not afford the parties a full and fair opportunity to litigate the question of subject-matter jurisdiction"; error treated as harmless

because parties then fully argued issue on a motion to alter or amend judgment); *Williamson*, 645 F.2d at 414 (When considering dismissal for lack of subject matter jurisdiction, "the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss."). The United States Court of Appeals for the Fifth Circuit recently addressed the issue under the comparable federal rule: "When considering [a] Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the district court must give the plaintiff an opportunity to be heard, particularly when disputed factual issues are important to the motion's outcome." *In re Eckstein Marine Service L.L.C.*, 672 F.3d 310, 319 (5th Cir. 2012). The court added that "an oral hearing is not always necessary if the parties receive an adequate opportunity to conduct discovery and otherwise present their arguments and evidence in court." 672 F.3d at 619-20. Appellate courts enjoy no authority to usurp a party's right to be heard because an issue bears on subject matter jurisdiction. See *Ryser*, 295 Kan. at 456-57 (Kansas Supreme Court requests supplemental briefs on subject matter jurisdiction); *Funk Mfg. Co. v. Franklin*, 261 Kan. 91, 94-95, 927 P.2d 944 (1996) (same); *Travelers Property Cas. v. Good*, 689 F.3d 714, 717 (7th Cir. 2012); *Youkelsone v. FDIC*, 660 F.3d 473, 475 (D.C. Cir. 2011).

Here, however, Judge Green and Judge Bruns have done just that in reaching out to affirm based on Purdum's consent. They do not suggest the issue has been raised or argued. They point to nothing in the briefs arguing consent. There is nothing. Judge Green extracts a generic paragraph from the affidavit of Monsignor William J. King submitted to the district court with the Archdiocese's motion to dismiss—a motion that did not raise consent as an issue. The description refers to the consent couples commonly make in preparation for a sacramental marriage. But Monsignor King did not attend to Purdum and Harcsar in their wedding preparation. Purdum has not had any opportunity to provide his version of what he consented to. Nor has he had a need to do so, since consent was not an issue argued to the district court or in the appellate briefing. It has only become an issue with the release of

this opinion. Neither side, of course, has offered legal argument or authority on consent.

Judge Green takes the same approach with qualified privilege, a defense to defamation claims independent of religions clause issues. The parties have not briefed or argued any of the myriad defamation defenses that might be available to Harcsar. All of those issues were deferred while the parties battled over church autonomy and absolute privilege. At this juncture, this case should no more be decided on qualified privilege than on consent.

The proper course, here, would be to reverse and remand on the issues that actually have been briefed. In due course, the district court would then take up consent and any defamation defenses Harcsar might assert. Will assessing the nature and scope of Purdum's consent to a sacramental marriage itself unduly entangle the district court in the religious values and doctrine of the Catholic Church? Perhaps. Is Harcsar entitled to qualified privilege? Maybe. But until the parties frame those issues factually and present their view of the controlling law, the court has no way of knowing.

My colleagues' willingness to raise and decide consent as a jurisdictional issue without a factual record and legal argument is both inappropriate and wrong on multiple levels. If nothing else, it seems manifestly unfair. Nothing in my dissent forecloses consideration of consent or any defamation defense on a developed record and after the parties have been given an opportunity to be heard.

c. *In affirming, the majority opinions mask the constitutional issues*

Finally, I would suggest Judge Green and Judge Bruns have couched their positions almost as if Purdum had sued the Archdiocese and sought to upend the annulment, when, of course, he has done neither. That camouflages the complexity of the constitutional issues this case actually presents. If Purdum were suing to prevent the Catholic Church from annulling his sacramental marriage to Harcsar, the dispute would be relatively straightforward

with settled law against him. See *Milivojevich*, 426 U.S. at 708-09; *Bryce*, 289 F.3d at 655.

Judge Green submits that "Purdum's defamation action involves an ecclesiastical subject matter," thereby entangling the courts in "a church matter." He cites *Watson*, the United States Supreme Court case predating Fourteenth Amendment incorporation, in support of his position. *Watson*, 80 U.S. (13 Wall.) at 728-79. But the point *Watson* makes—and it remains part of the modern church autonomy doctrine—is this: Persons "aggrieved by" decisions of religious tribunals on "controverted questions of faith" or by decisions of church leadership "for the ecclesiastical government" may not "appeal to the secular courts and have them reversed." *Watson*, 80 U.S. (13 Wall.) at 728-79. Purdum's suit alleging Harcsar defamed him does not patently fit that description. He has not sued to derail the annulment of the marriage. Harcsar's entitlement to an annulment under Catholic Church canon likely would delve into "questions of faith" and almost certainly into "ecclesiastical government." But assuming Harcsar alleged Purdum to be bipolar and assuming such a statement to be defamatory, whether she made the assertion knowing it to be false seems, on its face at least, distinct from matters of religious belief or church doctrine. And at this stage in the litigation, without any discovery, we are left to judge based on facial appearances. Had Purdum alleged Harcsar represented him to be a blasphemer or otherwise sacrilegious as the grounds for the annulment, the facial appearance materially changes. But that is not what we have before us.

Judge Green then concludes with rhetorical inquiries. He first suggests a fact-finder in this case could not determine if Harcsar made the bipolar statement believing it to be true without also exploring her religious sincerity or conscience. But posing the question really doesn't dictate the answer. Just how Harcsar's religious sincerity bears on whether she knew a representation that Purdum was bipolar might be true or false is hardly clear. If Judge Green is suggesting that Harcsar could succeed by arguing that as a devout Catholic she sincerely wanted an annulment so the representation was justified true or not, he ventures into the area of religious necessity as a defense, another legal issue essentially unex-

plored in this case. Though it would be, at best, a debatable defense. See *Smith*, 494 U.S. at 878-79; *City of Wichita v. Tilson*, 253 Kan. 285, 289-90, 296, 855 P.2d 911 (1993) (rejecting religious necessity as defense to criminal prosecution). Judge Green next asks how might that fact-finder address Harcsar's defense of consent without getting entangled in "the administration and procedures of the Archdiocese's annulment proceedings?" The answer on this record must be that we don't know until the parties inform us of the factual basis for the consent. And we would do well to await their legal arguments about those facts before dismissing this suit.

As I have suggested, Judge Bruns errs in disposing of this case for lack of subject matter jurisdiction by relying, at least in part, on the unfounded absolute privilege described in *Cimijotti*. Judge Bruns submits that such a privilege, emanating from the religious clauses of the First Amendment, is "imperative" for the Roman Catholic Church to provide annulments of sacramental marriages. But he cites no authority, apart from *Cimijotti*, for that privilege. The circumstances here arguably belie its necessity—the Catholic Church has granted Harcsar's annulment, according to counsel. Judge Bruns turns to the, as yet, unlitigated issue of consent to bolster the application of church autonomy to affirm dismissal. Finally, Judge Bruns argues that because the allegedly defamatory statement was published "within the context of a consented-to ecclesiastical proceeding," this suit must be barred. He cites *Hosanna-Tabor* as analogous. But there, a called minister sued, under federal antidiscrimination laws, to reverse the church's decision to terminate her employment. That litigation challenged a decision of the church on the selection of a spiritual leader, a matter long recognized to be inextricably tied to religious doctrine and its inculcation and, thus, constitutionally protected from review in secular courts. Purdum's suit doesn't rest on those attributes—at least based on the allegations in the pleadings and the prediscovery record—and doesn't invoke the church autonomy doctrine in the same obvious way. While Judge Bruns suggests his decision is confined to the "unique facts" of this case, his approach could be seen as expanding church autonomy to cover any statement made in a pur-

portedly confidential proceeding related to worship or religious activity. The extension, however, is ill defined and readily could be construed to shield a church elder falsely branding a congregant a convicted sex offender, a sociopath, or a host of other noxious things during a private administrative meeting of ministers and deacons. This case, as it has been presented to us, is not a vehicle for taking the law in that direction.

The record and the actual argument of the parties require a narrow conclusion to this appeal allowing Purdum to continue. On a factually developed record, his case might fall based on religious clause protections or defamation law defenses. But we have no legal warrant for accelerating the judicial process to dispense with discovery and to dismiss on grounds that haven't been presented, let alone argued.

I would reverse and remand for further proceedings.